People *v.* Butler.

## THE PEOPLE *v.* BUTLER.

Where a grand jury consisted of twenty-three persons, nine of whom were challenged for cause by a prisoner, and the charge was sustained by the Court, and nine jurors excluded from the investigation of the case, and an indictment was found by the remaining fourteen: *Held,* that the indictment was found by a legally constituted grand jury.

Where the prosecuting attorney was allowed by the Court to ask a witness on a trial for murder, what was the business of the prisoner, under the objection of the latter, on the ground of irrelevancy: *Held,* that where the record did not contain all the evidence given, the question must be presumed to be relevant, as such might often be proper.

Nor can the answer of the witness that the prisoner was a gambler, be considered as an injury to the prisoner, at a time when gambling was licensed by law.

Prosecuting attorneys, however, should do their duty faithfully, but no more. They should never act as employed counsel, not take advantage of temporary public excitement against the prisoner, or of any prejudice against him, arising from any cause whatever.

No words of reproach, how grievous soever, are sufficient provocation to reduce the offence of an intentional homicide with a deadly weapon, from murder to manslaughter.

APPEAL from the District Court of the Fourteenth Judicial District, County of Nevada.

The prisoner was indicted by the grand jury of the county of Sierra, for the crime of murder, alleged to have been committed upon Robert Moffat, in September, 1855. The grand jury was composed of twenty-three persons, and nine of them chal-

lenged for cause by the prisoner, and the challenge sustained, and the nine jurors thus challenged, were ordered by the Court of Sessions not to be present in the grand jury room, during the investigation of the case of the prisoner. The indictment was found by the remaining fourteen. A change of venue was had to the county of Nevada, where the defendant was tried and convicted before the District Court, and sentenced to be executed on the ninth day of October, 1857. From which judgment the defendant appealed.

The errors assigned, and the grounds upon which they are based, fully appear in the opinion of the Court.

*Wm. M. Stewart and A. A. Seargent* for Appellant.

After the exclusion of nine persons from the grand jury in the case of appellant, there remained but fourteen qualified grand jurors in said cause, which, appellant contends, was an illegal grand jury, and not competent to find any bill of indictment against him.

The statutes of this State direct that " where, of the persons summoned, not less than seventeen, and not exceeding twenty-three attend, they shall constitute the grand jury. If, of the persons summoned, less than seventeen attend, they shall be placed on the grand jury, and the Court shall order the sheriff to summon a sufficient number to complete the grand jury." Compiled Laws, p. 354, § 9.

The language of the statute expressly holds that grand jury incomplete, that is composed of less than seventeen—not less than seventeen shall constitute the grand jury. If less than seventeen attend, the sheriff must summon a sufficient number to " complete the grand jury." Then it must be incomplete with less than that number, and an illegal grand jury.

The next section of the statute (§ 10, ibid,) requires that, if from a challenge to the panel, or to an individual grand juror, it becomes necessary, the sheriff shall summons a sufficient number of persons " to complete the grand jury."

When the grand jury is reduced below seventeen by individual challenges, it is as incomplete, as though of the original number summoned, less than seventeen attend, and the sheriff must summons persons to complete it. By every intendment of the statute, such a grand jury is an illegal body, and its acts void. See the case of The People *v.* Thurston.

So far as the appellant was concerned, there was a grand jury of fourteen empanneled.

He had a right to seventeen, and however legal the grand jury might have been in other cases, when his was called, its elements dissolved, and necessarily so, from the manner of its creation, and left with nine, a residuum of the authority of a grand jury.

It may be contended, that in the case of the People *v.* Roberts, April Term, 1856, this Court passed upon this question, and decided it adverse to the propositions we have stated. An examination of the opinion in that case shows this to be erroneous.

This Court first passes upon the question of incompetency. In the case at bar, we raised no objection to the individual competency of the fourteen allowed to sit upon the jury, but to their collective sufficiency.

The Court next passes to the question of the necessity of the concurrence of seventeen in finding the bill of indictment, and correctly, as we believe, lays down the doctrine that the concurrence of twelve only is necessary.

We take it as evident from the foregoing, that objections based upon the fact, that after a legal grand jury has been constituted, some one or more of them absenting themselves from the jury-room, will not vitiate the proceedings of the rest.

If seventeen qualified persons are empanneled in a given case, a temporary indisposition of one of them, or the fact appearing that one is a witness, and thus causing a less number to act, the indictment will be good if twelve concur in finding it. We do not take it for granted that the Court in fact, or by implication, did, or intended to, make void the statute of the State before referred to, that provides that when from challenges to individual grand juries, less than seventeen qualified to sit remain, the sheriff shall summon persons to complete the grand jury. Comp. Laws, 354.

But in the case at bar, as we have shown, but fourteen grand jurors were empanneled, and all their proceedings, affecting the appellant, were void, *ab initio.*

The second point of exception of the appellant is, briefly, that the prosecution improperly put in issue his character upon the trial, he having called no witness and asked no witness any question authorizing such an act.

The prosecution introduced a witness named Rufus Kibbie, " and after having asked several questions, which were answered by the witness, asked the witness what was Mr. Butler's business at Downieville ?"

This was excepted to, and the exception overruled, and was answered as follows : " I do not know that Butler was employed particularly in any business; all that I ever saw him at was gambling."

We contend that such questioning and such testimony was not only grossly irrelevant, but a positive injustice to the appellant—calculated to draw the minds of the jury from the real issue, and create prejudice against him in the minds of the jury. The mere statement of the question about Mr. Butler's business, suggests many reasons why it should have been ruled out of the Court.

29

In any view of the case, it did not affect the question of his guilt, as charged. Whether he was an actual or reputed gambler—whether he was a preacher or a knave—whatever might have been his profession, political character, or religion, while he did not put these things in issue, the prosecution, by all precedent and authority, could not do so, and should have been rebuked by the Court below for attempting it.

This view of the law is not novel; it breathes from every page of the authorities. See 24 Wendell, in The People v. White; 2 Mass. R., 318; 14 Wend., 654.

Roscoe says : "The prosecutor cannot enter into evidence of the defendant's bad character, unless the latter enable him to do so by calling witnesses to his good character; and even then the prosecutor cannot examine as to particular facts." Roscoe Cr. L., 97.

Upon this point, permit us further to direct the attention of the Court to the following authorities : Com. v. Hardy, 2 Mass., 317; People v. Akley, 9 Barbour, 609 ; State v. O'Neal, 7 Iredell R., 251; Com. v. Webster, 5 Cushing, 325.

The next question that arises is, will the Court take judicial cognizance, that gambling is an offence and immoral. In the case of People v. Raynes, 3 Cal. R., 366, the Court say : "that the statute re-enacts the common law in making this evil occupation a misdemeanor, punishable by fine and imprisonment, and the license is proposed as a sort of compromise for the offence, doubtless with the hope of regulating and thereby diminishing the bad influence of a vice, which it is impossible to suppress."

With reference to the third point, we thought the instruction at the time more rigorous than the case required, but do not wish to urge it upon the attention of this Court.

*Wm. T. Wallace, Attorney-General,* for the People.

The first error assigned by the prisoner is, that inasmuch as his challenge to nine of the twenty-three grand jurors was sustained, and the nine directed by the Court of Sessions not to participate in finding the indictment, that it left but fourteen grand jurors who could act in finding the indictment, and that fourteen is an insufficient number to find an indictment.

In the case of the People v. Roberts, (6 California Rep., 214,) the question came before this Court, whether if there be a grand jury of seventeen, and one be absent, or incompetent, the finding of an indictment would be vitiated thereby—and it was determined that it would not.

The second supposed error, consists in the fact, that the Court permitted the prosecution to prove the avocation or calling of the prisoner. And it is assumed here, by the prisoner's counsel, that this was done for the purpose of prejudicing the prisoner's case, by proving that he was a gambler. To my mind, it does

People *v.* Butler.

not appear that the question was improper. It will be borne in mind, that the record does not purport to set out all the evidence in the case, but only the evidence upon certain points; now, if there was a question of identity of the prisoner involved in the case below, it was perfectly proper to prove the business which he followed, and any other similar circumstance, to point him out as the particular man charged with the crime. Other circumstances might be suggested, in which such evidence would be proper, and in which the Court would have committed an error, if it did not permit the question to be asked—and so far as the bill of exceptions shows, any one of these hypotheses may have existed in the case In this view, the rule so often repeated in this Court, that all intendments are in favor of the correctness of the proceedings below, applies with force. If, in one view of the case, the evidence was admissible and proper, the Court will intend that it was properly admitted, unless the bill of exceptions excludes this conclusion. In the case of Rogers *v.* Hall, 3 Scammon, p. 6, the Supreme Court of Illinois say, that a bill of exceptions is to be esteemed as a pleading of the party offering it, and if liable to the charge of ambiguity, uncertainty, or omissission, it ought, like any other pleading, to be continued against the party who prepared it.

The third supposed error assigned, is found in the instruction of the Court, to the effect that mere words of reproach, without further cause or provocation, will not reduce the crime from murder to manslaughter, where the killing was done with a deadly weapon, such as a pistol, as in this case. I apprehend, that if there be one question which is settled in criminal jurisprudence, it is this. I do not suppose that an authority of note can be produced against the ruling of the Court. Wharton's Crim. Law, p. 368.

BURNETT, J., after stating the facts, delivered the opinion of the Court—FIELD, J., concurring.

The first ground of error alleged by the learned counsel of the prisoner, is, that the grand jury finding the indictment was not legally constituted, there being only fourteen present at, and participating in, the investigation of the particular case. But this objection was not well taken, as has already been decided by this court, in the case of The People *v.* Roberts, April, 1856. The statute requires the concurrence of twelve grand jurors to find an indictment; and when that concurrence is had, it is not perceived how the prisoner can be injured by the absence of the others. In this case the grand jury consisted of the proper number, but nine of them were excluded from participating in the proceedings in reference to this particular case.

The next ground taken by the counsel of the prisoner, is that the District Court erred in permitting the district-attorney to

ask a witness for the prosecution, this question, namely; "What was Mr. Butler's business at Downieville?" This question was objected to on the ground of irrelevancy, the objection was overruled and the prisoner excepted. The witness then answered, "I do not know that Butler was employed particularly in any business; all that I ever saw him at, was gambling."

The record in this case does not contain all the evidence given at the trial. We must, therefore, presume that the state of the testimony was such as to authorize the question, if admissible at all under any state of case. Several witnesses had been examined by the prosecution, and what was the testimony given by them, the bill of exceptions does not state. If, therefore, we can conceive of a state of case when such a question would be proper, we are compelled to presume that it existed in this case.

At the time the question was put, the Court could not know what would be the answer of the witness. The question might have been material for the purpose of identifying the prisoner; or of testing the memory of the witness, as to whether he knew the prisoner. There are many states of cases in which the question might have been relevant and proper.

But we cannot perceive that any injury could result from the question, if proper instructions were given by the Court, which we must presume was done. At the time the alleged murder was committed, there was no statute in force making gambling a criminal offence; but there was a statute authorizing gaming as a lawful business. Com. L., 826.

There was, then, nothing criminal in the eye of the law, as it then existed, in the practice of gaming.

If then, it was necessary to put such a question to the witness under a state of the case we must presume to have existed, the danger of injury to the prisoner was too remote to justify us in reversing the judgment of the Court below upon this ground. Every prisoner is entitled to a fair trial before an unprejudiced jury; and Courts should be very careful to exclude all irrelevant questions that might prejudice the prisoner. But it is imposible for the law to exclude every question that might prejudice some minds, without entirely defeating the ends of justice. In putting questions of doubtful character the district-attorney should be required by the Court to state, in advance, the purpose for which the evidence is offered. The State never asks any thing but justice. On the part of the State the prosecution is but a fair and just inquiry into the guilt or innocence of the accused. She can have no interest in convicting the innocent or in releasing the guilty. She stands perfectly impartial as between the community and the individual. Prosecuting attorneys should therefore, do their duty faithfully, but no more. They should never act as employed counsel. No advantage should be taken of temporary public excitement against the prisoner, or of any preju-

duce against him arising from any cause whatever. And if such attempts are made, the Court before whom the prisoner is tried, should put a stop to them.

But in this case there is nothing before us to show that the question was improper when put. Our duty is "to disregard .technicalities, and to determine from the whole case whether the prisoner has had a fair trial, and the judgment is correct." The People v. Moore, July, 1857.

The last error assigned by the counsel of the prisoner is that the Court erred in giving the following instructions:

"Again, mere words of reproach, without further cause or provocation, will not mitigate an intentional homicide committed with a deadly weapon, so as to reduce it to manslaughter.

"It therefore follows that if the prisoner at the bar intentionally killed Moffat by shooting him with a pistol, intending to take his life, and that there was no injury committed or attempted to be committed by Moffat, and no provocation except by the use of words, then the jury should find the prisoner guilty of murder."

The language used by Moffat was this, as stated in the bill of exceptions. "I want nothing to do with you;" "I do not think it any honor for a man to have anything to do with you;" or, "I want nothing to say to you, or any of your kind;" or, "I want nothing to do with you, I know you of old."

This language, the counsel of prisoner insisted, at the trial, was "sufficient to excite an irresistible passion in a reasonable person, and that if the jury should be of that opinion, they could not find the defendant guilty of a higher crime than manslaughter."

It is but justice to the learned counsel for the prisoner to say, that they do not urge the point upon this Court. But it is deemed proper, as the point is made, though not urged, to say a few words respecting it.

All the authorities upon criminal law are against the position. The rule upon this subject is well stated in Wharton's Criminal Law, p. 368, where it is said:

"Words of reproach, how grievous soever, are not provocation sufficient to free the party killing from the guilt of murder; nor are indecent, provoking actions, or gestures expressive of contempt or reproach, without an assault upon the person."

Every State, and every community, has a right to adopt the means necessary to its own protection, and what those means are, the society must judge. The law of self-protection is as applicable to communities as to individuals. Communities are but corporations, or artificial beings, capable of united action through proper organs. Every member of society forms a part of this artificial being, and the State, therefore, has the greatest interest in preserving the lives of its people. The security, power,

and greatness, of a State, depend upon the number and character of its population. The State, and each member of the body politic, have a reciprocal interest in the welfare of each other, and owe certain mutual duties and obligations to each.

From these positions, it results legitimately, that no civilized State can adopt a steady system of law that will permit the destruction of its people for light and trivial causes. As the State has an interest in every one, and every one owes a duty to the State, no man has the right to destroy himself, or to render himself incapable of performing his duty to his country. When he does so, he commits a great moral and political wrong, which no system of enlightened jurisprudence can sanction or approve. If a man was permitted to mutilate his person, or cripple himself, so that he could not perform the duties of a good citizen in time of peace, or defend his country in time of war, then the State would be compelled to protect him, while he could render no service in return. And it was long ago held in the case of a man who cut off his arm to avoid entering the army, that he was guilty of an offence. And what a man has no right to do to himself, others have no right to do for him, except in cases of *necessary self-defence.*

As the State must look to the protection and preservation of its citizens, it cannot accommodate its permanent system of laws to the peculiar pride, or views, of individuals. And if we take a just and rational view of the subject, there can be nothing in mere words, or gestures, that should "excite an irresistible passion in a *reasonable* person."

If untrue, they cannot alter the fact. The truth still remains unchanged. But if true, the party has no right to complain. It is enough for a just man to do right himself. That is his business. That is a matter within his own control. If others do him injustice in words, that is their fault, not his. There are, and must be, good and intelligent men enough in every community to do him justice, sooner or later. All that is required is time and patience. A *reasonable* man ought to have patience and forbearance. But suppose the law should justify the destruction of human life for mere words, what must be the practical result of such a theory? Where would it end? How would justice be practically administered?

Under such a theory, it would become necessary to establish, by judicial decision, what were, and what were not, words of insult and reproach. If this were not done, no man could tell, *in advance*, what he might say himself, or for what he might kill another man for saying: and the Courts would not only have to do this, but they would have to permit the truth or falsity of the words to be shown. It would not do to allow a man to be killed simply because he told the prisoner the *truth.* In criminal prosecutions for libel, our Constitution allows the truth to

be given in evidence for the defendant. And in all actions for libel, or slander, the defendant may justify by proving the truth of the words written or spoken. To tell the truth would hardly be considered a crime in our country. And if we look simply to the *effect* that words are apt to have upon men, we should find that when *true*, they generally produce the most "irresistible passion." The actual effect is generally in proportion to the true elements of truth in fact, and the character of the charge made. And the character of the charge made will depend upon the peculiar views of the person accused.

Whatever may be the views of particular individuals upon this question, it is apprehended that no such a theory ever could be tolerated in any system of law. There is no anticipating the practical effects it would have upon the welfare of society.

After considering the whole case of the prisoner, we think there is no sufficient cause for reversing the judgment of the Court below, which is, therefore, affirmed.