[Crim. No. 4601. In Bank. Apr. 30, 1946.]

THE PEOPLE, Respondent, v. JOHN VALENTINE, Appellant.

Marshall Denton, Jr., for Appellant in District Court of Appeal and Clyde C. Shoemaker for Appellant in Supreme Court.

Robert W. Kenny, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant has been tried on a charge of murdering Raymon Boyd. A jury found him guilty of murder of the first degree and fixed the penalty at life imprisonment. He appeals from the judgment of conviction and from an order denying his motion for new trial. Defendant contends, and we agree with his contentions, that the instructions relating to the differences between the degrees of murder and the definition and effect of provocation and sudden passion upon the degree or class of the homicide were prejudicially erroneous. Defendant further urges that the evidence is insufficient to support the finding that the homicide was murder of the first degree and that, since the errors in the instructions relate only to the degree and class of the offense, we should exercise our power (Pen. Code, § 1181, par. 6) to modify the judgment. Although it is doubtful whether the evidence (hereinafter summarized) could sustain a verdict of murder of the first degree, it is unnecessary for us to determine that point. The evidence is amply sufficient to sustain a verdict of either murder of the second degree or voluntary manslaughter. In that condition of the record we cannot say that as a matter of law it establishes either murder of the second degree or manslaughter to the exclusion of the other. Therefore, a new trial is necessary.

Defendant John Valentine and his wife, at the time of and for about two years prior to the killing, lived in a house at the rear of No. 3715 Wall Street, Los Angeles. Three other adults, members of the family, resided with them. The defendant was steadily employed at Goodyear Tire & Rubber Company and went to his work early in the morning. At the front of the lot was a two-family house, one side of which was occupied by deceased and his wife at the time of and for about five months prior to the killing. The Boyd and Valentine families were not acquainted with each other. Defendant and deceased spoke to one another for the first time approximately one-half hour before defendant shot deceased.

Before daylight, at about 6:15 o'clock (daylight saving time) on the morning of November 18, 1943, defendant left his home to go to work. In order to get to the street from defendant's house it was necessary to use a cement walk which led up to and around the house at the front of the lot. The walk turned under the bathroom window of the Boyd residence. The lower sill of this window was six feet four inches above the walk. Defendant is six feet five inches tall; his eyes are six feet one inch above the ground. After defendant left his house and before he reached the turn of the walk Boyd spoke to him from the bathroom window. Boyd accused defendant, in effect, of being a trespasser and of being there for the purpose of peering into the window. Defendant denied that he was a trespasser, denied that he had looked into the window and explained that he lived in the rear house and was on his way to work. An argument and quarrel developed which quickly culminated in the tragic homicide.

According to the testimony of Mrs. Boyd, widow of decedent, the circumstances of the killing were as follows: Her husband, who had not yet dressed, awakened her and told her that he had spoken to someone through the bathroom window. Boyd then went to the front of the house and looked out the living room windows. After about five minutes Boyd returned to the bedroom, spent about fifteen minutes dressing, then went out the front door. She heard him talking with someone. Boyd called to her and she went onto the front porch. Boyd and a man whom she later learned was Valentine were standing in the front yard; "both were talking at the same time" and she could understand only part of what was said. "My husband asked him what he was doing around the back of the house"; she did not understand Valentine's reply. Boyd and Valentine continued to talk and "I understood Mr. Valentine to say that he lived in the back and if he would go around the back he would show him where he lived." Mrs. Boyd went into her house, put on her shoes, and returned to the front porch. Boyd and Valentine were not there, so she went through her house and onto the back porch. About six or eight people were in the back yard and Boyd "was demonstrating to the people, to Mrs. Valentine, what Mr. Valentine did when he spoke to him . . . my husband walks back or ran back there, rather [to the rear house], and spread his hands out against the

wall like this (illustrating), and leaned up against the wall like that. . . . He said he was showing the way the position that Mr. Valentine was in after he had spoke to him and he ran. . . . Then some woman came out on the back porch of that little house . . . and she told my husband that he must be mistaken, that that man was her husband and he lived there, and that he must have the wrong man, so my husband said —— turned to Mrs. Valentine and said, 'Well, it was you [sic], wasn't it?' and Mrs. Valentine said, 'Yes.' Then my husband proceeded to walk away from him and passed him and said, 'O. K., forget it,' and then Mr. Valentine came behind him and said, 'I didn't like the way you talked to me this morning and I could have shot you.' So my husband turned and— slightly turned to him and said, 'Well, why don't you shoot me?' . . . He had both of his hands in his pockets, Mr. Valentine did, . . . continually from the time I first saw him until he pulled this gun out of his pocket." Defendant took a revolver "out of his right pocket, and took his left hand and fooled with—was fooling with the gun, was doing something to it, I don't know what, for a minute, and they were both talking at the same time, and I couldn't understand what either one was saying." She further testified that defendant and Boyd were then standing about "6 or 8 feet" apart; that Boyd's hands were "down by his side"; that no profanity was used by Boyd in addressing the defendant and that "I said, 'Oh, Mister, please don't shoot him,' and I said it again, and he shot him . . . [T]he shot spun him around, and he fell on his back." Mrs. Boyd "ran in the house immediately and called the ambulance and police, and when I came back everybody had gone."

Officer Hoffman testified that at about 7:05 a. m. on November 18, 1943, he received a call over his police car radio to go to 3715 Wall Street. Two or three minutes later he and a fellow officer arrived at the Wall Street address. They went to the rear of the property and the defendant advanced to meet them. "I asked the defendant what happened; well, he said that he had trouble and shot a man. . . . I asked the defendant where the gun was that he had used, and he pulled back his coat, the left side of his coat, and, as I recall, the gun was sticking in his belt . . . The gun had six loaded bullets in it . . . I said, 'Where is the shell that you fired?' He said, 'I reloaded the gun and the shell is in the house.' And we went in the house and got the shell out of

the wastepaper basket." Defendant was taken to the University Police Station where he gave the following statement:

"This morning I started out to work; it was dark, and I heard somebody say, 'Hey, where you going?' I looked around and I could see a lighted cigarette through the window. Then he asked me who I was and I told him my name is John Valentine, and I was on my way to work. Then I asked him what his name was, but he didn't tell me. Then he said to me, 'Do you live back here?' and I said yes, I'd been living back here for . . . almost two years." Defendant returned to his house "For my cigarettes . . . and got the gun after Boyd had spoken to me out of the window and I didn't know who he was." "When I got around to the front the man I know now as Boyd came out the front door and stopped me again. He asked me again what I was doing here and I said I live back here. Then he went to the door and called his wife out and she came out. When she came out she told Boyd that that wasn't the fellow. Then I walked around to the back with Boyd to show him where I lived. Then he called his wife again and when she came out she said again, 'Honey, that's not the fellow, that's the wrong fellow.' Then he said, 'I saw you around here this morning and you ran up and ducked behind the bushes.' I told him no, I only . . . live here, I wasn't ducking behind the bushes. I told him again that I lived here and Boyd said, 'I'll see about that.' He had both his hands in his pockets, and he started to come towards me and I shot him." Defendant further stated that before he shot, Boyd attempted to strike or detain him and "I ducked back out of his way"; that Boyd was "six or eight feet away" when defendant fired. Defendant was then asked, "At the time you shot Boyd you didn't think that your life was in danger, did you?" and replied, "No, the only thing, when he talked to me, he acted like he was riding over me and it made me hot." To the question, "You could have gone on to work and not stopped if you hadn't wanted to?" defendant answered, "Well, it was more on account of him making me hot than because of what he said that I stopped."

The testimony of defendant is as follows: When he left his house to go to work on the morning of November 18, "I only had got about four steps out of the house" when a loud voice said something which the defendant did not understand. "I stood and looked but couldn't see anyone, . . . then . . .

I seen a reflection of a cigarette . . . and I couldn't tell whether
it was on the outside or inside, and this voice said, 'Who is
you? What are you doing back there? . . . What is your
name? Where are you going?' . . . I said, 'My name is John
Valentine, fellow; I live here; I am on my way to work.' He
said . . . 'You are a God damned liar.' . . . At that time I
still didn't see him . . . I said, 'I live here, I told you.' . . .
He said, 'You are a God damned liar, you do not live here.
. . . I will find out in a little while. You wait there.' He
said, 'What were you doing, looking up here in my window?'
I said, 'Fellow, I wasn't looking in your window. . . . How
could I look in your window from where I am standing over
here?' . . . He said, 'You wait there, I will find out whether
you live here or not.' . . . I stood there a little while and felt
in my pocket for my cigarettes and they wasn't in my pocket,
so I went on back in the house, and when I picked up my
cigarettes something said to me, 'Why don't you get your
gun? You don't know who is out there.' So I just picked
the gun up and stuck it in my belt and walked on out. I
come out there and I didn't see anyone . . . I walks on around
the house and . . . out to the sidewalk of the public, . . . and
when I got there . . . there was some 'scrub,' . . . and this
man appeared from behind this 'scrubs' and stepped right
in front of me . . . and I said, 'Fellow, . . . you the fellow
that stopped me this morning, wasn't you?' He said, 'Yes.
. . . What about it?' and he started at me. I said, 'Nothing.
I just want to tell you I live here,' and I backed on up, show-
ing him where I lived. . . . I just continued backing and talk-
ing to him. . . . He said, 'I knowed God damned well I was
going to get even with you, and I knowed I was going to catch
up with you.' '' The two went around the Boyd house, as Boyd
continued his accusations and defendant continued his denials
and explanations and urged that they ''try to get along with
each other . . . I don't like trouble.'' After they reached the
yard between Boyd's and Valentine's houses Boyd ''yelled for
his wife and she ran out . . . and that is the first time I ever seen
the lady, and she said, 'No, honey, that is the wrong man.'
. . . And he still pushed on toward me and at that time, a
little after, I heard another voice holler, 'What is the matter?'
I said, 'This man . . . don't want to let me get out of here to go
to work.' . . . He continued cursing me and shoving me around
and shoving me around, and I said, 'Fellow, . . . listen, stop
shoving me like that . . . Man, I am late for work. I don't like

trouble.' '' By this time the members of defendant's household had come out. Mrs. Higgins, defendant's sister-in-law, and Boyd's wife told Boyd that he ''had the wrong man.'' Mrs. Boyd said, '' 'Honey, . . . leave the man alone.' He didn't leave me alone, and I thought while he was speaking to them I could get by, and I went to pass him again and he shoved me like he was going to strike me . . . I ducked back from him. . . . I said, 'Listen, I have been ducking and I don't want to shoot you. . . . Please leave me alone.' He says, 'Shoot,' and . . . he had his hands in his pockets and he swung the right out, and when the hand came out with whatever he had, I had been backing up, . . . but when he swung as if he had something in his hand which he had in his pocket, . . . I just pulled the gun out of my pocket and shot him.''

On cross-examination defendant testified that he had never before fired a gun. He further testified that when Boyd first spoke to him ''I was afraid of the voice at that particular time of the morning'' and that thereafter, when they met in the yard, he was afraid of Boyd and ''the way he approached me, I just figured he was doing something he didn't have no right to; and after me explaining to him . . . I was explaining to him all of the time.''

Mrs. Valentine, Mrs. Higgins, and Mr. Edmond, also a member of defendant's household, came out of their house when they heard the altercation. They testified that Boyd repeatedly accused defendant of peeking in his window, cursed him and stated that ''That is not the first time that has happened. I knew I was going to catch him and break his God damned neck.'' When defendant attempted to pass Boyd, saying, ''Mister, get out of the way and let me go to work,'' Boyd said, ''Don't be in such a God damned hurry,'' shoved defendant, and put his right hand in his pocket. Boyd thereafter started toward defendant as if he were going to shove him again and defendant said, ''Don't come another step, else I will shoot.'' Boyd replied, ''You can't scare me with your God damned gun,'' came on, and defendant fired.

In three essential and fatal respects the instructions given in this case resemble the instructions condemned in *People* v. *Thomas* (1945), 25 Cal.2d 880 [156 P.2d 7]: (1) The jury were told that the existence of a specific intent to kill (which, of course, exists in voluntary manslaughter and in second degree murder as well as in some types of first degree murder) constitutes a homicide murder of the first de-

gree; (2) the effect of provocation and passion as reducing the class of a homicide from murder to manslaughter was emphasized and the effect of provocation and passion as possibly precluding or making doubtful the formation of a deliberate and premeditated intent to kill was ignored; and (3) the jury were told, in effect, that the burden of proving circumstances which would mitigate the offense from murder of the first to murder of the second degree was upon the defendant.

The jury were erroneously instructed that "If the unlawful killing is done *without the provocation and sudden passion which reduces the offense to manslaughter,* or is done in the commission of an unlawful act, the natural consequences of which are dangerous to life, or is committed in the attempt to perpetrate a felony other than those mentioned in the description of murder in the first degree, or the circumstances of the killing show an abandoned heart, this is *murder of the second degree, unless* the evidence proves the existence in the mind of the slayer of *the specific intent to take life. If such specific intent exists at the time of such unlawful killing the offense committed would of course be murder of the first degree.*" (Italics added.) Such instruction, under the facts of this case, completely eliminated the statutory difference between murder of the first degree and murder of the second degree and required the jury, if they found the homicide to be murder at all, to find it to be murder of the first degree. (See Pen. Code, § 189; *People* v. *Sanchez* (1864), 24 Cal. 17, 28; *People* v. *Holt* (1944), 25 Cal.2d 59, 90-91 [153 P.2d 21]; *People* v. *Thomas* (1945), *supra,* 25 Cal.2d 880, 902; *People* v. *Bender* (1945), 27 Cal.2d 164, 178 [163 P.2d 8].) Some further confusion as to the degrees of murder may well also have been contributed by the instruction that, where provocation adequate to reduce an intentional killing to *manslaughter* is shown, "although the intent to kill exists, it is not that *deliberate* and malicious *intent* which is an *essential element* in the crime of *murder.*" (Italics added.) The language of the last quoted instruction is that of *People* v. *Freel* (1874), 48 Cal. 436, 437, quoted in *People* v. *Elmore* (1914), 167 Cal. 205, 210 [138 P. 989], but it is incorrect in differentiating manslaughter from murder on the basis of *deliberate* intent and in declaring that *deliberate* intent is an essential element of murder. Deliberate intent, under the statute (Pen. Code, §§ 187, 189) is not an essential element of murder, as such. It is an essential element of one class only of first degree

132

murder and is not at all an element of second degree murder.

The jury were also instructed (and the idea was emphasized by repetition) that the existence of "adequate provocation" reduces an intentional killing from murder to manslaughter. But they were not advised that the existence of provocation which is not "adequate" to reduce the class of the offense may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation. If they were not impliedly precluded from considering at all the matter of provocation in determining the degree of murder they were at best left to infer its materiality from instructions that to constitute murder of the first degree the intent to kill "must be formed upon a pre-existing reflection and not upon a sudden heat of passion sufficient to preclude the idea of deliberation" and that malice "is implied when no considerable provocation appears" (Pen. Code, § 188). This omission was particularly serious when considered with the instruction above discussed that the specific intent to kill constitutes an unlawful homicide murder of the first degree, and the instruction hereinafter discussed that "the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation . . . devolves upon the defendant." Under such instructions the jury may have believed defendant's and his family's testimony as to Boyd's conduct, determined that defendant was not justified in killing Boyd in self-defense and that there was not such provocation as would reduce the offense to manslaughter (both matters covered by several explicit instructions), and thereupon given no further consideration to such testimony.

The jury were instructed, substantially in the words of section 1105 of the Penal Code, that "Upon the trial for Murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation or that justify or excuse it, devolves upon the defendant, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter or that the defendant was justifiable or excusable." To this instruction was added the incomplete and confusing explanation that "While the burden of showing the circumstances under which the act is *justified* or *excused* devolves upon the defendant, he is only bound under this rule to produce such evidence as will create in the minds of the jury a reasonable doubt of his guilt *of the offense charged.*" (Italics added.)

The giving of instructions in the language of section 1105 has been countenanced in a number of decisions by the courts of this state. But the confusion in the minds of the jury as to "burden of proof" which is likely to attend the giving of such an instruction has been pointed out (concurring opinion of Mr. Justice Traynor in *People* v. *Albertson* (1944), 23 Cal.2d 550, 587-589 [145 P.2d 7]) and it has been said, "logic suggests that since such section in reality merely declares a rule of procedure and does not relieve the state of the burden of proving each and every essential element of guilt beyond a reasonable doubt the propriety of reading it to the jury, even with a proper explanation, is doubtful." (*People* v. *Thomas* (1945), *supra,* 25 Cal.2d 880, 896.)

The explanation above quoted which was given to the jury in this case is inadequate. In the first place the jury were not advised that section 1105 "has no application whatsoever in determining the degree of murder, if the homicide is found to constitute murder, but is pertinent . . . only in relation to determining whether the homicide constitutes murder or manslaughter or is justifiable or excusable." (*People* v. *Thomas* (1945), *supra,* pp. 895-896 of 25 Cal.2d; see, also, *People* v. *Howard* (1930), 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385]; *People* v. *Bender* (1945), *supra,* 27 Cal.2d 164, 179; Fricke, California Criminal Law, pp. 104, 105.) The offense charged must have been understood by the jury to be murder of the first degree. The instruction therefore placed on defendant the burden of raising a reasonable doubt as to the degree of murder (if the homicide was murder). But, as shown, the law does not place that burden on a defendant.

In the second place the explanatory paragraph, by purporting to remove the effect of the instruction in the words of section 1105 so far as "circumstances under which the act is justified or excused" are concerned, only emphasizes the unexplained instruction that "the burden of proving circumstances of mitigation . . . devolves upon the defendant." Once the jury found that the killing was not justifiable or excusable the explanatory paragraph as phrased had no further application to their deliberations. Thus a conscientious jury, following the instructions, might believe that defendant's evidence tending to show mitigating circumstances must do more than raise a reasonable doubt not only as to the degree (*People* v. *Thomas* (1945), *supra,* pp. 896-897) but also as to the class of the homicide. Other instructions do nothing to correct this.

Particularly is this so because the explanatory instruction refers to "a reasonable doubt of his guilt of the offense *charged*" (italics added) and the jury knew that the offense charged was murder and was claimed by the prosecution to be murder of the first degree. The evidence of the prosecution does not tend "to show that the crime committed only amounts to manslaughter." The statutory instruction as to presumption of innocence and the definition of reasonable doubt (Pen. Code, § 1096) which was given does not clear up the confusion, for it states only that "in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an *acquittal*." (Italics added.)

■ The above mentioned errors in instructions relative to the degree of the offense are made even more serious by the instructions that "There need be . . . no appreciable space of time between the intention to kill and the act of killing. . . . A man may do a thing . . . deliberately . . . from a moment's reflection as well as after pondering over the subject for a month or a year" and a man "can premeditate, that is, think before doing the act, the moment he conceives the purpose, as well as if the act were the result of long preconcert or preparation." As held in *People* v. *Bender* (1945), *supra,* 27 Cal.2d 164, 182-185, this combination of instructions, taken as a whole, substantially deletes the only difference, in this type of case, between first and second degree murder.

■ Defendant next complains of the giving of a stock instruction that "If the accused was engaged in the performance of an unlawful act, and if the deceased attempted in a lawful manner to prevent the performance of such unlawful act, and if, while so endeavoring to prevent the same, the defendant in anger and solely for the purpose of revenge, or to enable him to carry out his unlawful design, so interfered with by said deceased, attacked the latter with a deadly weapon, intending to kill said deceased, and did, under such circumstances, carry such intention into execution, the fact that defendant was in a passion would not mitigate or excuse such homicide, but the crime committed would in such case be murder in the first degree. It is not less murder because the act is done suddenly after the intent to commit the homicide is formed. It is sufficient that the *malicious intention* precedes and accompanies the act of homicide." (Italics added.) This instruction is manifestly erroneous. According to its first sentence, if the accused in a sudden, violent quarrel growing

out of the protests of deceased against the commission by defendant of any unlawful act, however trivial, killed deceased with a deadly weapon, the homicide would be murder in the first degree. That is not the law. The statement as made transgresses the rules both as to voluntary manslaughter and as to the difference between first and second degree murder. ■ The second and third sentences of this instruction are likewise manifestly erroneous if, as they apparently do, they too refer to first degree murder. They destroy the statutory difference in the degrees of murder and authorize conviction of first degree murder upon proof of facts amounting only to second degree murder. (*People* v. *Thomas* (1945), *supra,* 25 Cal.2d 880, 898; *People* v. *Bender* (1945), *supra,* 27 Cal.2d 164, 181, 182.)

■ Defendant complains in another respect of the stock instructions concerning the degrees of murder. Such instructions contain the following (italicized) erroneous statements of law: "There are *certain kinds of murder* which *carry with them conclusive evidence of premeditation.* . . . These cases are of two classes: First. *Where the killing is perpetrated by means of poison, etc. Here the means used is held to be conclusive evidence of premeditation.* Second. *Where the killing is done in the perpetration, or attempt to perpetrate, some one of the felonies enumerated in the statute* [Pen. Code, § 189], *here the occasion is made conclusive evidence of premeditation. Where the case comes within either of these classes the test question: Is the killing willful, deliberate and premeditated? is answered by the statute itself.* . . . But there is another and much larger class of cases included in the definition of murder in the first degree, which are of equal cruelty [etc.]. . . . In this class the legislature leaves the jury to determine, from all the evidence before them, the degree of the crime, but prescribes for the government of their deliberations *the same test* which has been *used* by itself *in determining the degree of the other two classes,* to-wit: *The deliberate and preconceived intent to kill.*" (Italics added.) Of course the fact that a killing is committed in the perpetration of, or attempt to perpetrate, one of the five felonies enumerated in section 189 of the Penal Code is not conclusive, or necessarily any, evidence that such killing was deliberate and premeditated. ■ Even where the killing in perpetration or attempted perpetration of one of the named felonies is unintended and accidental, nevertheless, as held in *People* v. *Lindley* (1945), 26 Cal.2d 780, 791 [161

P.2d 227], "the offender 'is guilty of murder of the first degree by the force of the statute.' [Citations.] If the evidence establishes conclusively that the murder was so committed, then only a verdict of murder of the first degree may properly be rendered. And even where the showing is not conclusive, if the record affords substantial support for the conclusion that one of the enumerated felonies was perpetrated or attempted, and the killing was committed in such perpetration or attempt, the judgment must be affirmed. [Citations.]" (See, also, Fricke, California Criminal Law, page 100, and cases there cited.) ██ Similarly the murderer who kills by torture or poison may intend only to inflict suffering, not death. Evidence of the means used might support an inference that the killing was willful, deliberate, and premeditated, but where the jury has found that the killing was by poison, lying in wait, or torture it is not their function to go farther and draw inferences as to the manner of the formation and carrying out of an intention to kill. In such a case the question which the statute (Pen. Code, § 189) answers affirmatively is not, "Is the killing willful, deliberate and premeditated?"; it is, "Is the killing murder of the first degree?" ██ Killings by the means or on the occasions under discussion are murders of the first degree because of the substantive statutory definition of the crime. Attempts to explain the statute to the jury in terms of nonexistent "conclusive presumptions" tend more to confuse than to enlighten a jury unfamiliar with the inaccurate practice of stating rules of substantive law in terms of rules of evidence.

██ We cannot agree with defendant's further contention that in a case of a killing such as the present one it is erroneous to instruct the jury at all as to a homicide being murder of the first degree because of the means or occasion of its perpetration. Such an instruction, correctly worded, can properly be given as illustrating the more heinous character and typical cruelty of the forms of murder which the Legislature has provided are of the first degree, as opposed to those of the second degree.

██ The jury were told, in the words of section 192 of the Penal Code, that "Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds: 1. Voluntary—upon a sudden quarrel or heat of passion. 2. Involuntary—[defined]." They were further told that "if the intent [to kill] exists and the killing is unlawful, it will be murder,

even though done upon a sudden quarrel or heat of passion, unless there was adequate provocation. [There follows a statement of what is not adequate provocation, hereinafter quoted.]'' Although the two instructions can perhaps be reconciled by lawyers and judges, who read them with a background of knowledge that neither means exactly what it says, a jury might well be confused by being told that voluntary manslaughter is an unlawful killing upon a sudden quarrel or heat of passion, but that an unlawful killing upon a sudden quarrel or heat of passion is murder except in certain circumstances, which excepted circumstances do not affirmatively define adequate provocation but merely assert that certain conduct and acts, no matter how provoking in fact, are to be considered in law as not provoking in effect.

The above mentioned instruction as to what is not adequate provocation reads as follows: ''It is a settled rule in law that neither provocation by words only, however opprobrious, nor contemptuous or insulting actions, or gestures without an assault upon the person, nor any trespass against lands or goods, are of themselves sufficient to reduce the offense of an intentional homicide with a deadly weapon from murder to manslaughter.'' ▮▮▮ They were further told (and this instruction is correct) that ''To reduce a felonious homicide from the grade of murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of such character as would be naturally calculated to excite and arouse the passion. . . . Heat of passion is defined as such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances, and consequently no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.''

▮▮▮ Defendant urges that the instruction as to what is not ''adequate provocation'' which is first above quoted ''amounts to judicial legislation engrafted upon the provisions of section 192 of the Penal Code,'' and is inconsistent with the last quoted (and correct) instruction defining ''heat of passion.'' He points out that the Penal Code does not require that the ''sudden quarrel'' be more than verbal or that the ''heat of passion'' be roused by a particular type of conduct, to constitute a killing manslaughter rather than murder.

Through the industry of counsel for the defendant as reflected in his outstandingly excellent briefs the historical basis for the challenged portion of the provocation instruction is made clear. The Crimes and Punishments Act of 1850 (§ 23), following a common law principle, provided: "In cases of voluntary manslaughter there must be a serious and highly-provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing." (See *People* v. *Butler* (1857), 8 Cal. 435, 441.) No such limitation is expressed in the Penal Code enacted in 1872, but the Code Commissioners' notes to section 192 (which defines manslaughter) state that "No words of reproach, however grievous, are sufficient provocation to reduce the offense of an intentional homicide from murder to manslaughter.—*People* v. *Butler* [*supra*], 8 Cal., p. 435." In *People* v. *Turley* (1875), 50 Cal. 469, 471, this court, without mentioning the fact that the Crimes and Punishments Act of 1850 had been repealed and superseded by the less stringent provisions of the Penal Code, said that the principle of the Butler case is "so long and firmly established in this State that its discussion would be out of place." But, directly contrary to the Turley case, and in accord with the new (1872) statute, the court in *People* v. *Hurtado* (1883), 63 Cal. 288, 292, said that an intentional killing is manslaughter "when it is committed under the influence of passion caused by an *insult or provocation* sufficient to excite an *irresistible passion* in a reasonable person." (Italics added.) In 1892 this court (in *People* v. *Bruggy,* 93 Cal. 476, 481 [29 P. 26]) failed to follow or cite the Hurtado case and said that before the adoption of the Penal Code the law was as above quoted (Crimes and Punishments Act, § 23) and that "While no similar provision is found in the Penal Code, yet it has never been even suggested that the law pertaining to the subject of manslaughter underwent any change upon the adoption of the code. Such provision was probably omitted from the code upon the ground that it was entirely unnecessary and surplusage, being simply a reiteration of a principle of law settled and established by all text-writers upon the subject." But in *People* v. *Logan* (1917), 175 Cal. 45 [164 P. 1121], this court reverted to accord with the Hurtado case and reversed a judgment of conviction of murder of the second degree because the jury were instructed in the language of the repealed section 23 of the Crimes and Punishments Act. It was

said (pp. 48-49 of 175 Cal.), "that section ceased to be the ▮▮
by failure to re-enact it in the Penal Code [citation]. In th▮▮
present condition of our law *it is left to the jurors* to say
whether or not the facts and circumstances in evidence are
sufficient to lead them to believe that the defendant did, or to
create a reasonable doubt in their minds as to whether or not
he did, commit his offense under a heat of passion. The jury
is further to be admonished and advised by the court that this
heat of passion must be such a passion as would naturally be
aroused in the mind of an ordinarily reasonable person under
the given facts and circumstances, and that, consequently, no
defendant may set up his own standard of conduct and justify
or excuse himself because in fact his passions were aroused,
unless further the jury believe that the facts and circumstances
were sufficient to arouse the passions of the ordinarily reason-
able man. Thus, no man of extremely violent passion could
so justify or excuse himself if the exciting cause be not ade-
quate, nor could an excessively cowardly man justify himself
unless the circumstances were such as to arouse the fears of
the ordinarily courageous man. Still further, while the con-
duct of the defendant is to be measured by that of the ordi-
narily reasonable man placed in identical circumstances, the
jury is properly to be told that the exciting cause must be such
as would naturally tend to arouse the passion of the ordi-
narily reasonable man. *But as to the nature of the passion
itself, our law leaves that to the jury, under these proper
admonitions from the court.* For the fundamental of the in-
quiry is whether or not the defendant's reason was, at the
time of his act, so disturbed or obscured by some passion—not
necessarily fear and never, of course, the passion for revenge—
to such an extent as would render ordinary men of average
disposition liable to act rashly or without due deliberation
and reflection, and from this passion rather than from judg-
ment." (Italics added.) The foregoing quotation is a clear
and correct statement of the law. Nevertheless, it is pointed
out to us, since 1917 this court has on at least two occasions
ignored the Logan (1917) case and followed the Bruggy
(1892) case. (See *People* v. *Manzo* (1937), 9 Cal.2d 594, 599
[72 P.2d 119] ; *People* v. *French* (1939), 12 Cal.2d 720, 744
[87 P.2d 1014].)

As could naturally be expected (and emphasizing the neces-
sity for purging our case law of the confusion) the two extant
lines of directly conflicting authorities in this court on this

rtant question of law have produced their replicas in cisions of the District Courts of Appeal. See *People* v. *Chutuk* (1912), 18 Cal.App. 768, 771 [124 P. 566], and *People* v. *Jackson* (1926), 78 Cal.App. 442, 448 [248 P. 1061], on one side of the question, opposed by *People* v. *Golsh* (1923), 63 Cal.App. 609, 614 [219 P. 456], and *People* v. *Davis* (1928), 94 Cal.App. 192, 198 [270 P. 715], on the other side. The Chutuk (1912) case, in accord with the Bruggy case but without citation of authority, ignored the Hurtado (1883) case and "saw no error" in a charge "that adequate provocation is not produced by opprobrious, contemptuous actions or gestures without an assault upon the person, or trespass against lands or goods." The Jackson (1926) case, likewise in accord with the Bruggy case and likewise without citation of authority, ignored the Logan (1917) case as well as the Hurtado case and declared (at p. 448 of 78 Cal.App.) that "it is a settled rule in law that neither provocation by words only, however opprobrious, nor contemptuous, or insulting actions, or gestures without an assault upon the person, nor any trespass against lands or goods, are of themselves sufficient to reduce the offense of an intentional homicide with a deadly weapon from murder to manslaughter." But the Golsh (1923) case cited both the Hurtado and Logan cases and held (at p. 614 of 63 Cal.App.), in accord with their more liberal rule, that "The provocation which will stir in the heart of the slayer that heat of passion which reduces the homicide from murder to manslaughter must be such as would have a like effect upon the mind and emotions of the average man—the man of ordinary self-control." And in the Davis (1928) case the court completely ignored the conflicting authorities, cited the Hurtado case, the Logan case, and the Golsh case, and broadly declared (at p. 198 of 94 Cal.App.), "In this state *it has always been held* that to reduce a killing from murder of the second degree to manslaughter on the ground of sudden quarrel or heat of passion 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances, and that, consequently, no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions are aroused, unless further *the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.*' " (Italics added.) The statements of the rule in the last two cases, like those in the Hurtado and Logan cases, in specifying

as the test the effect of the surrounding circumstances (in language broad enough to include the words, conduct, acts, etc., of the deceased) upon an ''ordinarily reasonable man'' or an ''average man,'' without the limitation asserted in the Code Commissioners' notes, are manifestly inconsistent with the cases above mentioned which have adhered to the principle stated in the long since repealed Crimes and Punishments Act of 1850 and the Butler (1857) case.

It is to be noted, of our own decisions, that neither the Hurtado (1883) case nor the Logan (1917) case was expressly overruled in the Bruggy (1892) case or in the Manzo (1937) case or in the French (1939) case. Likewise, of the District Court of Appeal decisions, neither the Golsh (1923) nor the Davis (1928) case has been overruled or disapproved. Yet obviously the French, Manzo, Turley, Bruggy, Chutuk, and Jackson cases do not correctly state the law if the Logan, Hurtado, Golsh, and Davis cases state it correctly. Fairness to the profession in general, and in particular to the courts of lower jurisdiction, demands that one group or the other of these cases be squarely overruled. It cannot be gainsaid that section 192 of the Penal Code in defining voluntary manslaughter did omit the more stringent language of the Crimes and Punishments Act of 1850. We are satisfied that the Code Commissioners could not, merely by including in their notes a statement from and citation of the Butler (1857) case, write into the seemingly more liberal new statute the stringent limitation of the older repealed act. If the cases since the adoption of the newer statute had uniformly followed the Code Commissioners' note, or if the Hurtado case, the Logan case, the Golsh case, and the Davis case had been squarely overruled in later cases, we should have a much stronger basis than is actually present for holding that a court-made limitation has become engrafted on the statute. But the Hurtado case, the Logan case, the Golsh case, and the Davis case opinions are thoroughly sound in their factual and logical bases; they stand without express challenge as stating the law of this state; they are consistent with the statute and with rules of statutory construction; no reason for overruling them has been pointed out in any of the inconsistent opinions. In view of the uncertain state of the law, with two directly conflicting rules to be found in the reports and none of the cases undertaking to discuss both rules and overrule inconsistent decisions, we find that we must now make a choice.

We are not bound to consider the principle written into the repealed Crimes and Punishments Act of 1850 (§ 23) as being still the law of this state merely because such principle was recognized in the common law. "No act or omission, commenced after twelve o'clock noon of the day on which this code takes effect as a law, is criminal or punishable, except as prescribed or authorized by this code, or by some of the statutes, which it specifies as continuing in force . . . , or by some ordinance. . . ." (Pen. Code, § 6.) "The rule of the common law, that penal statutes are to be strictly construed, has no application to this code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice." (Pen. Code, § 4.) ▇ A code section is presumed to be a continuation of the common law only when it and the common law are substantially the same. (*Scott* v. *McPheeters* (1939), 33 Cal.App.2d 629, 633 [92 P.2d 678, 93 P.2d 562].) Section 23 of the Crimes and Punishments Act of 1850 was substantially the same as the common law on the subject but section 192 of the Penal Code, which superseded it, is not substantially the same. It is obviously substantially different. ▇ "Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject [in this case, the *same* subject] is significant to show that a different intention existed." (23 Cal.Jur. 778, § 154; *Estate of Garthwaite* (1933), 131 Cal.App. 321, 326 [21 P.2d 465].) ▇ It is ordinarily to be presumed that the Legislature by deleting an express provision of a statute intended a substantial change in the law. (*Southern Pacific Co.* v. *McColgan* (1945), 68 Cal.App.2d 48, 54-55 [156 P.2d 81].) It has been repeatedly declared that where changes have been introduced by amendment it is not to be assumed that they were without design and, further, that by substantially amending a statute the Legislature demonstrates an intent to change the pre-existing law. (See *Loew's Inc.* v. *Byram* (1938), 11 Cal.2d 746, 750 [82 P.2d 1], and cases therein cited.) "The taking effect of the Penal Code on the first day of January, 1873, operated a repeal at that time of the old Crimes and Punishments Act of April 16, 1850." (*People* v. *Salvador* (1886), 71 Cal. 15, 16 [11 P. 801].) ▇ From the foregoing discussion it appears that the fact that the common law limitation on the types of circumstances which could be regarded as furnishing adequate provocation to reduce a homicide to man-

slaughter was originally a part of the statutory law of this state is not a proper basis for holding that it still is the law. On the contrary such fact, in the light of the repeal of the statute which incorporated it, together with enactment of a new law on the same subject with the important limitation deleted, strongly suggests that the Legislature intended a more liberal rule.

This court has been unanimous in holding that "When language which is reasonably susceptible of two constructions is used in a penal law ordinarily that construction which is more favorable to the offender will be adopted. In other words, criminal statutes will not be built up 'by judicial grafting upon legislation. . . . [I]t is also true that the defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute.' [Citations.]" (*People* v. *Ralph* (1944), 24 Cal.2d 575, 581 [150 P.2d 401].) Here we do not have even ambiguous language in the statute to support the restrictive limitation which was placed in the instruction. If the "sudden quarrel or heat of passion" specified in section 192 of the Penal Code is to be limited by the stringent language of the Code Commissioners' note that "No words of reproach, however grievous, are sufficient provocation to reduce the offense of an intentional homicide from murder to manslaughter," that limitation must be grafted upon the statute entirely by judicial construction. Some of the incongruence of imposing such a limitation upon the code definition is depicted in the very language of the Bruggy case which espouses it. The court there said (at p. 482 of 93 Cal.), "Nothing is more surely calculated to arouse the blood of some men to a heat of passion than grievous words of reproach, yet no words are sufficient provocation to reduce an offense from murder to manslaughter; and this principle is so well established in this state that discussion would be out of place." The principle had, of course, been established by the Crimes and Punishments Act of 1850, but that act had been repealed and the statement of such principle deleted from the superseding statute. We choose not to engage in a construction of this law which would rewrite into it the limitation which the Legislature has written out. If the simple language of the statute is to be altered by so rigorous a limitation we think the action should come from the Legislature. We prefer to

apply the statute as written, giving to its provisions "the fair import of their terms," and in so doing we follow *People* v. *Hurtado* (1883), *supra,* 63 Cal. 288, 292; *People* v. *Logan* (1917), *supra,* 175 Cal. 45, 48; *People* v. *Golsh* (1923), *supra,* 63 Cal.App. 609, 614; and *People* v. *Davis* (1928), *supra,* 94 Cal.App. 192, 198. ▮▮▮ The case of *People* v. *Butler* (1857), *supra,* 8 Cal. 435, decided under the Crimes and Punishments Act of 1850 (§ 23), cannot be regarded as authority for proper construction of the quite different code section enacted in 1872; the cases of *People* v. *Turley* (1875), *supra,* 50 Cal. 469, 471; *People* v. *Bruggy* (1892), *supra,* 93 Cal. 476, 481; *People* v. *Manzo* (1937), *supra,* 9 Cal.2d 594, 599; and *People* v. *French* (1939), *supra,* 12 Cal.2d 720, 744, insofar as they are contrary to the pertinent holdings in *People* v. *Hurtado, supra, People* v. *Logan, supra, People* v. *Golsh, supra,* and *People* v. *Davis, supra,* are overruled. Likewise, the pronouncements in *People* v. *Chutuk* (1912), *supra,* 18 Cal.App. 768, 771, and in *People* v. *Jackson* (1926), *supra,* 78 Cal.App. 442, 448, to the extent that they are inconsistent with the views herein expressed, are disapproved.

We express no opinion as to whether the evidence in this case shows such conduct on the part of Boyd as would arouse in a reasonable man the "heat of passion" referred to in section 192 of the Penal Code. Clearly the evidence, even if viewed most favorably to defendant, would not as he urges establish as a matter of law no higher offense than voluntary manslaughter. It would justify a verdict of voluntary manslaughter but it is not insufficient to sustain a verdict of second degree murder. The question is one of fact for the jury under proper instructions.

For the reasons above stated, and in order that the class and degree of the homicide can be found by a jury properly instructed, the judgment and the order denying defendant's motion for a new trial are reversed and the cause is remanded for a new trial.

Gibson, C. J., Carter, J., and Traynor, J., concurred.

Reporter's Note: On May 16, 1946, the opinion and judgment were modified to read as above.

SPENCE, J.—I concur. It is apparent from reading the foregoing opinion, together with the recent cases which are cited therein, that a painstaking attempt has been made to

clarify the law with respect to the distinctions between first degree murder, second degree murder and voluntary manslaughter, and to indicate the nature of the instructions which should be given to juries concerning such distinctions and also concerning other matters. It would appear, however, that something more than judicial clarification is required in order that clear, concise, and understandable instructions may be given in this important class of cases where the accused is charged with the unlawful killing of a fellow human being. I believe that the real difficulty is inherent in our statutory provisions and that the time has come for a legislative reexamination of all code sections relating to homicides in the light of the decisions construing those sections.

The substantive law relating to homicides is found mainly in sections 187 to 199 inclusive of the Penal Code. A mere reading of those sections demonstrates the difficulty which the ordinary layman, sitting as a juror, must encounter in grasping their significance when the substance of those sections is given in the form of instructions. Perhaps instructions covering the distinction between murder, defined as "the unlawful killing of a human being, with malice aforethought" (Pen. Code, § 187), and voluntary manslaughter, defined as "the unlawful killing of a human being, without malice . . . upon a sudden quarrel or heat of passion" (Pen. Code, § 192), should be easily understood. But when a further attempt is made to instruct upon the distinction between the two degrees of murder (Pen. Code, § 189) and upon the effect of provocation either in reducing the grade or degree of the offense or in rendering the homicide wholly excusable or justifiable (Pen. Code, §§ 195, 197 and 199), it is practically impossible to give adequate instructions in clear, concise, and understandable form because of the unavoidable complexity of the instructions dealing with those subjects. Nevertheless, it is the duty of a trial judge, under our existing statutory law, to instruct upon all these subjects, as well as many others, in practically every case involving a charge of murder.

When an accused is placed on trial for his own life following the taking of the life of another, it is important from the standpoint of the accused, as well as that of the state, that the jury, which is entrusted with the often perplexing problem of determining the facts, should not be embarrassed by complicated and confusing instructions concerning the law to be applied to the facts as found. In my opinion, the present

inevitable complications and confusion could be eliminated, at least in part, if the degrees of murder were abolished, leaving only the distinction between murder and voluntary manslaughter and permitting the jury to fix the punishment in the event that the accused is found guilty of murder, in the same manner that the jury is now permitted to fix the punishment in the event the accused is found guilty of first degree murder. (Pen. Code, § 190.) There appears to be little, if any, reason for dividing into degrees the offense defined as "the unlawful killing of a human being, with malice aforethought" (Pen. Code, § 187), so long as the jury is permitted to fix the punishment to be imposed upon one found guilty of such offense. On the other hand, the simplification of the law and the resulting simplification of the instructions dealing with the subject of homicides would appear to be of paramount importance. The question of whether the degrees of murder should be abolished is but one of several questions which might be considered by the Legislature in the event that it attempts to accomplish such simplification.

SHENK, J.—I dissent. The administration of justice should not be defeated by a too rigid adherence to a close and technical analysis of the instructions to the jury. This practice was overly indulged prior to 1911 when the people of this state took the reviewing courts in hand and prescribed the mandate that no misdirection of the jury should cause a reversal unless the error complained of resulted in a miscarriage of justice. (Const., art. VI, § 4½, adopted October 10, 1911.) This case is one, in my opinion, where the Constitution should be observed and the judgment be affirmed. Whether the attempted remaking of the law of the state from its early beginnings on the question of premeditation and deliberation has resulted in clarification is doubtful. I hesitate to conclude that this court in its long history of dealing with felonious homicides has been so oblivious of the defendant's rights as to have sent men to their doom under what is now said to be a prejudicial misapplication of the law. The long line of jurists preceding us are now said to have been unable to state the correct rule of law. Instructions, approved by this court for generations, have become the fixed law of the state. Any change in the line of clarification, if any be necessary, should be left to the Legislature.

Edmonds, J., concurred.