Filed 10/21/13  P. v. Woods CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LYNN WOODS,<br><br>    Defendant and Appellant. | B241041<br><br>(Los Angeles County<br>Super. Ct. No. BA379637) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Conditionally reversed and remanded with directions.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Herbert S. Tetef, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Lynn Woods was convicted of one count of first degree murder (Pen. Code,[1] § 187, subd. (a)) and two counts of possession of a firearm by a felon (§ 12021, subd. (a)(1)). The jury also found true special allegations regarding firearm use (§ 12022.53, subds. (b)-(d)). On appeal, Woods challenges his murder conviction on the grounds that the trial court committed numerous instructional errors. Woods also requests that we review the in camera proceedings conducted by the trial court pursuant to his motion for production of documents under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). While we reject Woods's claims of error, we conditionally reverse the judgment and remand for a new *Pitchess* hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Charges

Woods was charged by information with one count of murder (§ 187, subd. (a)) with special allegations that he personally and intentionally discharged a firearm causing death (§ 12022.53, subds. (b), (c), and (d)). Woods was also charged with two counts of being a felon in possession of a firearm (§ 12021, subd. (a)(1)). He pled not guilty to all counts.

### II. The Murder of Terrence Butler

#### A. The Prosecution's Case

1. The Physical Evidence

At 2:33 a.m. on August 18, 2010, the Los Angeles Police Department (LAPD) received a 911 call from a residence in the 1800 block of West 67th Street in Los Angeles. LAPD officers responded within minutes, and discovered the body of Terrence Butler lying face down in an alley between 67th and 68th Streets. Investigating the alley, police recovered ten expended nine-millimeter shell casings and one fired bullet. Police

---

[1]     Unless otherwise indicated, all further statutory references are to the Penal Code.

also found a golf club and an empty Gatorade bottle near the body. A fingerprint on the bottle was matched to the right index finger of Sherman Smith. A blue Buick LeSabre registered to Woods was parked at the south end of the alley.

An autopsy disclosed that Butler sustained nine gunshot wounds, all of which entered his body from behind. The absence of any soot or stippling around the entrance wounds indicated the shooter was standing at least two or three feet away from Butler. One fired bullet and various bullet fragments were recovered from Butler's body during the autopsy.

Firearms analysis determined the shell casings, bullets, and bullet fragments recovered from the scene of the shooting and from the victim were fired from the same nine-millimeter semiautomatic handgun.

2. Witness Testimony

LAPD Detective David Ross testified that he arrived at the scene at approximately 4:00 a.m. His investigation led him to a residence at 1815 West 68th Street, where the occupants were ordered out of the house. About seven or eight people exited the house, including Raymond Young, Alicia Lewis, Colette Eldridge, Sherman Smith, and Uniquia Watson. Woods was not there.

At trial, Young, Lewis, and Eldridge testified for the prosecution. Anthony Young had known Woods for about 25 years. On August 17, 2010, he went to the house at 1815 West 68th Street to get high. Young obtained some crack cocaine from Woods, who was present at the house, and smoked it. Later, Young heard Butler knock at the front door and ask to be let in. Woods said, "[D]on't let him in." Butler continued to knock. After about five minutes, someone let Butler inside.

Butler then stood in the house with a golf club in his hand. Young heard Butler say this "used to be his spot." Woods replied, "Not anymore. This is where I'm at now." Later, Young heard Woods say to Butler, "Come on man, let's me and you go outside and talk." The two men then walked out the front door.

3

Shortly thereafter, Young heard 10 to 15 gunshots. Woods returned to the house holding a wrapped up jacket or sweater and handed it to Smith. Woods then turned off the lights in the house and left. According to Young, Woods was picked up by someone in a car.

Following the incident, Young identified Woods in a six-pack photographic lineup and told police he believed Woods was the person who had shot Butler.

Alicia Lewis testified that Smith lived at the house at 1815 West 68th Street, and that she stayed there three or four nights a week. According to Lewis, Woods began coming to the house in August 2010. Prior to the night Butler was killed, Lewis heard Woods tell Butler several times to stop coming to the house.

On the night in question, Lewis was sleeping in the living room. She awoke around 9:00 p.m. to find Butler inside the house. Butler had a conversation with someone and then left. About 30 minutes later, Butler returned and stood in the middle of the living room with a golf club in his hand. Lewis testified that Butler was "going off" and "raising hell." He was saying, "Fuck this shit, this is my neighborhood, nobody's gonna tell me what I can do over here, I'm going to make money where I want to make money at."

According to Lewis, a young man spoke to Butler and then went to the back of the house. Woods then approached Butler and said, "Let me have a word with you for a moment." Lewis went back to sleep. Lewis never saw Butler again; nor did she see Woods return to Smith's house after that night. She testified that Woods called the house the next day and asked her if the police had been there.

After the incident, Lewis identified Woods in a six-pack photographic lineup and told police Woods was the person who told Butler to go outside with him.

Colette Eldridge testified that she was at the house on the night of the shooting. Lewis had invited her there; she had never been to the house before. According to Eldridge, there were eight to ten people at the house, including Woods who was sitting at a table with a desktop computer. At one point, Eldridge saw a black semiautomatic

4

handgun on the table. She also saw Woods holding the gun when he went to answer the door.

Eldridge testified that at about 10:30 p.m., a man came to the house and then left with a woman. Sometime between midnight and 1:00 a.m., the man returned and knocked at the front door, but the "people in charge of answering the door" did not acknowledge his knocks. Eventually, Woods opened the door. The man was holding a golf club and asked why it took so long to open the door. Woods said, "No, I don't have to let you in."

Several minutes later, Woods asked the man to go outside to have a talk. Shortly thereafter, Eldridge heard "loud noises, possibly gunshots." Woods returned to the house alone. He spoke to some people, including Smith, and then left.

Eric Decelles also testified for the prosecution. Decelles had known Butler for four or five years. He testified that he saw Butler near 68th and Western at approximately 11:00 p.m. or midnight on the night he was killed. Butler was with his "baby mama" and stood with a golf club in his hand. Decelles stated, "I asked him what was up and he told me he was going to go in here and put hands on this person [Woods] for disrespecting his baby mama." Decelles did not see Butler again.

### B. The Defense Case

1. Witness Testimony

Sherman Smith testified for the defense. In August 2010, he lived at 1815 West 68th Street with his fiancé, Uniquia Watson. According to Smith, other people would come to the house and spend the night. Drugs were sold at the house on a regular basis. At the time of the shooting, both Woods and Butler were in charge of the drug sales.

Smith testified that Woods began coming to the house at the end of July and lived there in August. Woods stayed in the computer room and had a nine-millimeter semiautomatic weapon that he kept with him. Smith further testified that Butler began coming to the house at the beginning of August and was there almost every day. Butler was welcome at the house any time; Smith never had any "beef" with him.

5

On the night in question, Smith took some Seroquel and Vicodin to help him sleep, and fell asleep at 9:00 or 10:00 p.m. He woke up at about 5:00 a.m. when police arrived. According to Smith, Woods was not there and never returned to the house after that night. Woods did not hand him an object wrapped in a shirt that night. On the morning of August 18, 2010, Smith spoke to police and falsely told them he had spent the night at a different location and arrived home at 5:00 or 6:00 a.m.

Smith testified that the day after Butler was killed, a Hispanic man came to the house and told him Woods had sent him there to buy his car. The man gave him $200 and took Woods's car. Smith also testified that he was diabetic and drank Gatorade when his blood sugar level was low. As to the Gatorade bottle found in the alley with his fingerprint, Smith said he might have tossed it in the alley because he was too lazy to put it in the trash or he might have left it there while he was working on his car.

Sharmeka Dunbar also testified for the defense. She first met Woods in 2007 or 2008 and dated him for several years. According to Dunbar, she and Woods went to Smith's house a couple of times. Although Woods used drugs at the house, he never sold drugs there. Dunbar testified that she saw Smith sell drugs at the house. She also testified that Woods never lived at Smith's house.

The defense called Claude Allen as a witness. He relayed that he did lighting and electrical work and that from August 2010 to November 2010, Woods had worked on some jobs with him. The jobs required "six, eight-hour days." Allen testified that he never saw Woods sell drugs.

2. Woods's Testimony

Woods testified in his defense. In 2010, he was having problems with Latasha Bradley, the mother of his son. According to Woods, Bradley threatened that she would do everything she could to have him locked up. Woods became depressed and stressed, and started doing drugs.

Woods testified that in August 2010, he began going to Smith's house to hide away and to use drugs. Woods never lived at Smith's house and never sold drugs there.

6

He did not need to sell drugs because he made a living doing music and selling animals. According to Woods, Smith was the person who sold most of the drugs at the house. Smith also had women at the house who were prostitutes.

Woods testified that he knew Butler as someone who would come to Smith's house and "chase the females out." The people who controlled the house, including Smith, disliked Butler and did not want him there. According to Woods, there was jealousy and hate because Butler "mostly controlled that area." Woods relayed that Butler "would get upset and angry at times…about the people that was selling drugs there because he was in the area before they was, and that's what the main issue occurred at." That issue had nothing to do with Woods; he never had any problems with Butler.

On August 17, 2010, Woods arrived at Smith's house at approximately 8:00 or 9:00 p.m. There were a lot of people at the house, and Woods went to work on the computer. While he used the computer, there was a meeting at the back of the house, which did not concern him and which he did not attend.

At some point, Butler arrived and took a woman out of the house to prostitute for him. Butler returned to the house at about 1:00 a.m. A loud argument then broke out in the living room. Woods testified that Butler was saying, "[T]his is my neighborhood, you know, I'm not going to let nobody stop me from making my money." Woods further relayed that a man known as "T.D." came into the living room and argued with Butler. According to Woods, they "were arguing over the fact that T.D. and Sherman was best friends and they are from the same neighborhood." Butler then left the house.

Woods testified that he remained at the computer. After Butler left, he saw Smith exit his bedroom and go outside with a handgun. About five minutes later, Woods heard gunshots. Smith then returned to the house and told everyone to leave. Woods left the house and never returned.

## III. Verdict and Sentencing

At the conclusion of the trial, the jury convicted Woods as charged and found true the firearm use enhancement allegations. The trial court sentenced Woods on count 1

(murder) to a term of 25 years to life, with an additional term of 25 years to life for the section 12022.53, subdivision (d) enhancement; on count 2 (possession), the three-year upper term; and on count 3 (possession), one-third of the middle term of two years (eight months). The trial court stayed sentence on the two other firearm enhancements.

Woods filed a timely appeal.

## DISCUSSION

On appeal, Woods requests a *Pitchess* review and also argues that the trial court committed numerous instructional errors that require reversal of his conviction. Specifically, he contends that: (1) the trial court was required to instruct the jury sua sponte that provocation may reduce the degree of murder from first to second degree, and that the prosecution had the burden of proving the absence of provocation beyond a reasonable doubt; (2) the trial court was required to instruct the jury sua sponte with CALJIC No. 8.73; and (3) the trial court was required to instruct the jury sua sponte on third party culpability.

### I. The Matter Must Be Remanded for a New In Camera Hearing on Woods's *Pitchess* Motion

Prior to trial, Woods filed a motion under Evidence Code section 1043 and *Pitchess*, *supra*, 11 Cal.3d 531, seeking the review of any personnel records of Officer Ross regarding "complaints from any and all sources relating to acts of racial bias, ethnic bias, sexual preference bias/homo-sexual bias, gender bias, coercive conduct, violation of any constitutional rights, fabrication of charges, fabrication of evidence, fabrication of reasonable suspicion, fabrication of probable cause, illegal search and seizure, perjury, dishonesty, writing false reports, planting evidence, *Miranda* violations, coercive statements from witnesses and/or suspects, and any other type of misconduct amounting to dishonesty and moral turpitude…." The trial court granted the motion in part, agreeing to inspect personnel records but only in the areas of "falsification and fabrication of witness statements or leading witnesses to give false information." The court then

reviewed the records in camera and found there was no discoverable material to be provided to the defense. On appeal, Woods has requested that we conduct an independent review of the in camera proceedings and determine whether any discoverable information was withheld.

"When a trial court concludes a defendant's *Pitchess* motion shows good cause for discovery of relevant evidence contained in a law enforcement officer's personnel files, the custodian of the records is obligated to bring to the trial court all 'potentially relevant' documents to permit the trial court to examine them for itself. [Citation.] A law enforcement officer's personnel record will commonly contain many documents that would, in the normal case, be irrelevant to a *Pitchess* motion, including those describing marital status and identifying family members, employment applications, letters of recommendation, promotion records, and health records. (See Pen. Code, § 832.8.) Documents clearly irrelevant to a defendant's *Pitchess* request need not be presented to the trial court for in camera review. But if the custodian has any doubt whether a particular document is relevant, he or she should present it to the trial court. Such practice is consistent with the premise of Evidence Code sections 1043 and 1045 that the locus of decisionmaking is to be the trial court, not the prosecution or the custodian of records. The custodian should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion. A court reporter should be present to document the custodian's statements, as well as any questions the trial court may wish to ask the custodian regarding the completeness of the record. [Citation.]" (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1229 (*Mooc*).)

"'"A motion for discovery of peace officer personnel records is 'addressed solely to the sound discretion of the trial court.' [Citation.] A review of the lower court ruling is subject to the abuse of discretion standard."' [Citation.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 670.) We have reviewed the sealed transcripts of the in camera proceedings, which we find constitute an adequate record of the trial court's review of any documents

9

provided to it.  However, the record does not reflect what search the custodian made to find relevant documents, whether the custodian provided the court with Officer Ross's entire personnel file, or whether there was any document or category of documents that were not produced for the court's review.  Indeed, there is no indication as to which records the custodian reviewed in advance of the hearing.  The record also reveals the trial court failed to question the custodian regarding whether he had searched for any other and what records he searched.  This leaves us unable to conduct any meaningful review on appeal.  (*Mooc*, *supra*, 26 Cal.4th at p. 1229.)  Accordingly, the judgment must be reversed and the matter remanded for the trial court to conduct a new *Pitchess* hearing.  (*Id.* at p. 1231.)

## II.  The Trial Court Did Not Err In Instructing The Jury

### A. Instructions on Provocation

1.  Provocation Reducing Degree of Murder

Woods first contends that the trial court failed to instruct the jury that provocation, insufficient to warrant a finding of manslaughter, should nonetheless be considered on the question of whether there was premeditation and deliberation.  (See *People v. Valentine* (1946) 28 Cal.2d 121, 132 (*Valentine*) [subjective provocation that is inadequate to find voluntary manslaughter may nevertheless raise a reasonable doubt as to presence of premeditation and permit finding of second degree murder]; *People v. Padilla* (2002) 103 Cal.App.4th 675, 679 (*Padilla*) [same].)  Woods asserts the trial court failed to recognize evidence of the provocations which he suffered:  (1) On the night of the shooting, Butler told Decelles he was going to "put hands on [Woods]" because he disrespected his "baby mama"; (2) Butler went looking for Woods and found him at Smith's house; (3) Butler repeatedly knocked on the door and entered the house with a golf club in his hand; and (4) once inside, Butler was "going off" and "raising hell."

Deliberate and premeditated first degree murder may be mitigated to second degree murder if the jury finds that the defendant "formed the intent to kill as a direct

10

response to…provocation and…acted immediately" without deliberation or premeditation. (*People v. Wickersham* (1982) 32 Cal.3d 307, 329, disapproved on another ground by *People v. Barton* (1995) 12 Cal.4th 186.) Provocation sufficient to mitigate a murder to second degree murder requires only a finding that the defendant's subjective mental state was such that he did not deliberate and premeditate before deciding to kill. (*Valentine*, *supra*, 28 Cal.2d at pp. 131-135; *Padilla*, *supra*, 103 Cal.App.4th at p. 678; *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296.)

A pinpoint instruction "relate[s] particular facts to a legal issue in the case or 'pinpoint[s]' the crux of a defendant's case, such as mistaken identification or alibi." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119 (*Saille*).) A trial court has no sua sponte duty to give such a pinpoint instruction where it relates not to a defense but rather to an attempt to raise a reasonable doubt as to an element of the crime. (*Id.* at p. 1120.) Subjective provocation is not a defense to first degree murder, but evidence that the defendant was unreasonably provoked may create doubt concerning the existence of the elements of deliberation and premeditation. Accordingly, an instruction defining the type of provocation needed to reduce first degree to second degree is a pinpoint instruction, which need not be given sua sponte. (*People v. Rogers* (2006) 39 Cal.4th 826, 878-879 (*Rogers*); *People v. Lee* (1994) 28 Cal.App.4th 1724, 1732-1734.)

In *Rogers*, *supra*, 39 Cal.4th 826, the defendant, who had been convicted of first degree murder, asserted the trial court erred in failing to instruct "that provocation inadequate to reduce a killing from murder to manslaughter nonetheless may suffice to negate premeditation and deliberation, thus reducing the crime to second degree murder." (*Id.* at pp. 877-878.) The defendant had not requested an instruction to that effect. The Supreme Court held that such an instruction–embodied at that time in CALJIC No. 8.73– was a pinpoint instruction because it "relates the evidence of provocation to the specific legal issue of premeditation and deliberation." (*Rogers*, *supra*, 39 Cal.4th at pp. 878-879.) Accordingly, it "need not be given on the court's own motion." (*Id.* at p. 879.) As Woods did not request an instruction on provocation, the trial court did not err in failing to give one.

11

2.  Burden of Proof on Provocation

Woods also contends that the trial court erred in failing to identify the burden of proof for provocation.  Specifically, Woods claims reversal is required because the instruction given, (CALJIC No. 8.30), "failed to correctly state the law because it did not include the requirement that the prosecution prove the absence of subjective provocation beyond a reasonable doubt."

The trial court instructed the jury on first and second degree murder, malice aforethought, and deliberate and premeditated murder.  The instruction defining first degree murder, CALJIC No. 8.20, informed the jury that:  "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.  [¶] … [¶] The true test is not the duration of time, but rather the extent of the reflection.  A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree."  As to second degree murder, the jury was instructed that, "Murder of the second degree is the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation."  (CALJIC No. 8.30)  The jury was also instructed under CALJIC No. 8.71 that if it had a reasonable doubt as to whether the murder was of the first or second degree, it must give the defendant the benefit of the doubt and return a verdict of second degree murder.  Finally, the jury was also instructed that Woods was presumed innocent and the People had the burden of proving him guilty beyond a reasonable doubt.  (CALJIC No. 2.90.)

"Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions."  (*People v. Scott* (1988) 200 Cal.App.3d 1090, 1095; *People v. Lewis* (2001) 26 Cal.4th 334, 390.)  The instructions

12

informed the jury that the People's burden to prove premeditation and deliberation encompassed the burden to negate any reasonable doubt about imperfect provocation. Accordingly, although CALJIC No. 8.30 did not explicitly state that the People had the burden to prove "the absence of subjective provocation beyond a reasonable doubt," the point was adequately covered by the instructions which were given.

### B. CALJIC No. 8.73

Woods next contends that the trial court had a sua sponte duty to instruct the jury with CALJIC No. 8.73 that provocation may be considered in determining whether a homicide is first degree or second degree murder. That instruction states, "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation or premeditation."

As discussed above, the issue was settled by the Supreme Court in *Rogers*, *supra*, 39 Cal.4th 826. Accordingly, the failure of the court to give this instruction sua sponte at trial was not error.

### C. Instruction on Third Party Culpability

Finally, Woods contends the trial court erred in failing to instruct the jury sua sponte on his defense of third party culpability. According to Woods, the third party culpability evidence generally consisted of testimony that: (1) Smith initially lied to police about his whereabouts on the night of the murder; (2) Butler complained about being denied access to Smith's house, and Smith permitted others to infringe on Butler's drug sales; and (3) Woods saw Smith exit the house with a gun, and minutes later heard gunshots. Woods asserts that, absent the instruction, the jury might have understood that he had the burden of proving that a third party committed the crime. He argues the trial

13

court had a duty, pursuant to Evidence Code section 502, to instruct the jury sua sponte as to the burden of proof.[2]

"Section 1096a of the Penal Code declares that when the statutory definition of reasonable doubt is given (see Pen. Code, § 1096), no other instruction need be given defining reasonable doubt. Despite this section, a defendant, upon proper request therefor, has a right to an instruction that directs attention to evidence from a consideration of which a reasonable doubt of his guilt could be engendered." (*People v. Sears* (1970) 2 Cal.3d 180, 190; see also *Saille*, *supra*, 54 Cal.3d at p. 1119.) An instruction on third-party culpability, explaining the relationship between such evidence and the prosecution's burden to prove guilt beyond a reasonable doubt, is a pinpoint instruction that need be given only upon request. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.)

Here, the trial court instructed the jury according to CALJIC No. 2.90. The court also gave CALJIC No. 2.91, which specifically informed the jury that "[t]he burden is on the People to prove beyond a reasonable doubt that the defendant is the person who committed the crime" and that "[i]f, after considering the circumstances of the identification and any other evidence in this case, you have a reasonable doubt whether defendant was the person who committed the crime," the defendant must be found not guilty. The jury was further instructed on the factors to consider in proving the identity by eyewitness testimony (CALJIC No. 2.92.) These instructions sufficiently informed the jury that the People had the burden of proving beyond a reasonable doubt that defendant murdered Butler.

---

[2] Evidence Code section 502 provides: "The court on all proper occasions shall instruct the jury as to which party bears the burden of proof on each issue and as to whether that burden requires that a party raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact by the preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt."

## DISPOSITION

The judgment is reversed. The cause is remanded to the trial court with directions to hold a new hearing on Woods's *Pitchess* motion in conformance with the procedures described in this opinion. If the trial court finds there are discoverable records, they shall be produced and the court shall conduct such further proceedings as are necessary and appropriate. If the court again finds there are no discoverable records, or that there is discoverable information but Woods cannot establish that he was prejudiced by the denial of discovery, the judgment shall be reinstated as of that date.


                                                            ZELON, J.

We concur:



        PERLUSS, P. J.



        SEGAL, J.*

---

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15