Filed 5/12/14  P. v. Ortiz CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CARLOS ORTIZ,<br><br>    Defendant and Appellant. | B245429<br><br>(Los Angeles County<br>Super. Ct. No. BA357941) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge.  Affirmed as modified.

Carla Castillo, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Carlos Ortiz appeals from the judgment entered after his conviction by a jury of first degree murder, attempted willful, deliberate and premeditated murder and shooting from a motor vehicle with true findings on related criminal street gang and firearm-use enhancement allegations.  He contends the true finding on the gang enhancement allegation was not supported by substantial evidence and the court prejudicially erred when instructing the jury and by excluding prior consistent statements made by his girlfriend in support of his self-defense theory.  Except for the correction of minor errors regarding sentencing and imposition of the court security fee, we affirm

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Information*

Ortiz was charged by information with the murder of Christopher Herrera (Pen. Code, § 187, subd. (a)),[1] the attempted willful, deliberate and premeditated murder of Jessica Solano (§§ 664, 187, subd. (a)) and discharging a firearm from a motor vehicle (former § 12034, subd. (c), now § 26100, subd. (c)).  It was specially alleged as to each count the crimes had been committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and Ortiz had personally used and intentionally discharged a firearm causing great bodily injury or death in committing the offenses (§ 12022.53, subds. (b) & (d)).  Ortiz pleaded not guilty and denied the special allegations.

2. *The Trial*

    a. *The People's evidence*

In March 2007 Ortiz, a member of the Aztlan gang, was shot near the border between Aztlan territory and that of a rival gang, the Normandie clique of the Mara Salvatrucha 13 (M.S. 13) gang.  Ortiz told a Los Angeles police officer the shooter had M.S. 13 tattoos on his face and neck.  Ortiz had previously seen the shooter near the intersection of Irolo Street and 8th Street, an area the officer identified as the stronghold of the Normandie M.S. 13 clique.  Two years later, in April 2009, an officer frisked Ortiz and felt an object near his waist during a stop of a group of Aztlan gang members in the

---

[1]     Statutory references are to the Penal Code unless otherwise indicated.

2

parking lot of a fast food restaurant. Ortiz angrily told the officer he wore a colostomy bag as a result of being shot by an M.S. 13 gang member. He admitted he was an Aztlan member with the moniker "Demon" and explained the Aztlan members had gathered to discuss problems they were having with the "Monkey Shits," a derogatory term for M.S. 13.[2]

On the evening of May 22, 2009 Ortiz, his pregnant girlfriend (who was his wife by the time of trial) Lisette Velasquez, his uncle Oscar Rodriguez and Rodriguez's girlfriend Kenya Hernandez, who all lived together, went to a club to drink and dance. On the way they stopped at Velasquez's mother's apartment on Normandie Avenue near 8th Street (one block east of Irolo Street) so Velasquez could get some money.

According to Rodriguez and Hernandez, whose testimony was generally consistent, just before 3:00 a.m. the following morning Hernandez was driving the four home in a white Chevrolet Blazer when Ortiz asked if they could drive through a neighborhood to see if any of his friends were still out. Ortiz then directed Hernandez to the intersection of Irolo Street and 8th Street. After they circled the block several times and did not see anyone, Ortiz told Hernandez to drive around the block one more time.[3] As they turned down Normandie Avenue, Ortiz, who was sitting in the back seats with Rodriquez, asked Hernandez to roll down his window because the switch was not working. Hernandez did as requested and began to speed up, but Ortiz told her to stop. Within seconds of the vehicle stopping, Ortiz fired the gun twice through the window and then told Hernandez to drive away. Hernandez heard a woman scream and saw a man backing up and touching his chest. After the group arrived home, Ortiz borrowed Hernandez's cell phone so he could warn his "homeys" to stay inside because someone was probably going to attempt to retaliate for the shooting.

---

[2]    Ortiz had a tattoo of "Aztlan" on his neck and "AZT" on the skin between his left-hand index finger and thumb.

[3]    A video recording from a surveillance camera at 745 South Normandie Street showed a white Blazer passing by three times.

Velasquez's account of the shooting differed.[4] She testified she had asked if they could stop at her mother's apartment on the way home to get quarters for her laundry. Once in the area, they drove around the block looking for parking or for someone to open the door to the apartment building, even though she was worried it was dangerous because they were in M.S. territory. Velasquez instructed Hernandez to stop the car on Normandie Avenue when she thought she saw her mother's neighbor walking toward the building. A few seconds later a bald man, who looked like a gang member, and a woman, who may have made a gang sign, ran toward their vehicle. The man screamed something and appeared to reach into his pants for a gun. Velasquez ducked, screamed and heard gun shots—one far away and two close. Although Velasquez testified she did not see Ortiz shoot anyone, she had told detectives when interviewed after her arrest on June 18, 2009 that Ortiz shot the two victims in self-defense. She also said she told Ortiz to take the gun he had used out of the house because children were in the home. The interview was played for the jury. Velasquez testified at trial she only said Ortiz was the shooter because she was scared and was forced to make the statement by Los Angeles Police Detective Herman Frettlohr, the primary investigator, who had told her she would have her baby in jail and her other child would be placed in foster care if she did not cooperate.

Solano testified she and Herrera, her boyfriend and an M.S. 13 gang member known as "Chino," had been drinking in an apartment on Normandie Avenue between 7th Street and 8th Street during the early morning of May 23, 2009. Soon after they walked out of the apartment building and Herrera had finished speaking with Dora Lopez, an adjacent building's manager, Solano saw a white van drive by slowly. About two minutes later the vehicle drove by again. As Solano and Herrera were walking in the direction of the vehicle to cross the street, one of the passengers in the back shot Herrera

---

[4] Hernandez testified Velasquez had told her she was a member of Aztlan. Velasquez denied ever being a gang member and claimed Ortiz had stopped "gangbanging" about six months before she got pregnant.

and Solano, killing him and wounding her in the chest and neck.  Solano, a reluctant witness, testified no one yelled anything before the shots were fired.

Los Angeles Police Officer Joseph Cirrito testified at trial as a gang expert. Cirrito was assigned to the Olympic Division gang enforcement detail in May 2009 and was responsible for monitoring the activity of Aztlan and other area gangs.  Cirrito generally described gang culture, including how the commission of crime benefits a gang and increases the status of the gang member committing the crime.  He explained a gang member shot by a rival gang member would be expected to retaliate.  He also testified about Aztlan specifically—the gang's territorial boundaries, number of members (approximately 125), clothing, tattoos and rivalries.  With respect to crimes committed by Aztlan as one of its primary activities, the following exchange took place:

"Q.  And what are the primary activities of the Aztlan gang?

"A.  When I was working that particular area some of the crimes that they were doing at that time were gun possessions, possession of a gun, felon with a gun.

[¶] . . . [¶]

"Q.  I'm going to have to stop you there because I'm asking specifically about their primary activities, not what they do on the side.  It's their primary activities.

"[Defense counsel]:  Objection.  Lack of foundation.

"The Court:  Overruled.

[¶] . . . [¶]

"Q.  Well, you had prefaced your answer with, well, some of the crimes that they commit but what I'm asking is the primary activities of the Aztlan gang.

"A.  That would be extortion, the extortion getting money from the local food trucks or vegetable trucks, vendors, stolen vehicles, carjackings, gun possessions, assault with deadly weapons or robberies."

Officer Cirrito further testified he had contact in January 2009 with Ortiz and three other men.  Ortiz and two of the men admitted they were Aztlan gang members.  One of them, Ray Ochoa, had been convicted of possession of a firearm by a felon in July 2007.

Given a hypothetical based on the facts surrounding the shooting, Cirrito opined it was committed for the benefit of Aztlan. He further opined it was dangerous for a gang member to be seen in the heart of a rival gang's territory.

b. *The defense's evidence*

Ortiz, who did not testify on his own behalf, presented the testimony of witnesses to support his theory of self-defense. Dora Lopez testified she had an argument with Herrera in front of the building around 3:00 a.m. and he had threatened her. Just after Lopez went back inside her apartment building, she heard four to six gunshots and Herrera shout, "Mara Salvatrucha."

Jose Islas, who admitted he was a member of the Normandie clique of M.S. 13, denied he was present at the time of the shooting and that he was subsequently interviewed by detectives. A recording of the interview was played for the jury: Islas said he had been drinking with Solano and Herrera at the home on Normandie. He was outside, very drunk, when he saw a light colored minivan with three men in it and heard three to four gunshots. The vehicle sped away after the driver, a bald man, "burned the wheels like he stepped on it." Isla had also heard someone calling, "'Chino, come here.'" Although it is unclear from the interview, it appears Herrera was angry and yelling at someone and may have been "hitting [the] car up."[5]

Alex Alonso, a gang researcher at the University of Southern California since 1993, testified gang members frequently travel through rival areas simply "to function and deal with regular life" such as going to the market, gas station or a friend's or family member's house. He opined it was unlikely a gang member would take a family member or pregnant woman on a gang shooting and it would be unusual for a gang member to wait two and one-half years to retaliate.

---

[5]     The defense's gang expert testified "hitting up" means a gang member aggressively asks another gang member where he or she is from, trying to create a conflict.

3. *The Verdict and Sentencing*

The jury found Ortiz guilty of all the crimes charged and found true the special allegations Ortiz had personally used and intentionally discharged a firearm causing great bodily injury or death and the crimes had been committed to benefit a criminal street gang. The court sentenced Ortiz to 75 years to life in state prison consisting of 25 years to life for murder, plus a consecutive sentence of 25 years to life for the firearm enhancement, plus a consecutive sentence of life for attempted premeditated murder, plus 25 years to life for the firearm enhancement. The sentence for shooting from a vehicle was stayed pursuant to section 654.[6]

## DISCUSSION

1. *Substantial Evidence Supports the Jury's True Findings on the Criminal Street Gang Enhancements*

To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.]

---

[6]    The stayed sentence on count 3 included a 10-year criminal street gang enhancement pursuant to section 186.22, subdivision (b)(1)(C). Although not included in the minute order or abstract of judgment, at the sentencing hearing the trial court explained, because of the gang enhancements, there was a 15-year minimum parole eligibility date for the indeterminate life terms imposed on counts 1 and 2. (See § 186.22, subd. (b)(5).) Given the 75-year-to-life aggregate indeterminate life term imposed, those gang enhancements have little practical effect. (See *People v. Lopez* (2005) 34 Cal.4th 1002, 1009.) Nonetheless, we modify the judgment and direct correction of the abstract of judgment to indicate the minimum parole eligibility dates on counts 1 and 2.

A further correction of the judgment and abstract of judgment is also necessary with respect to the court security fees. As the People observe, the court imposed $40 court security fees on counts 1 and 2 ($80 total), but not on count 3, shooting from a motor vehicle. That was error even though the punishment for that offense had been stayed pursuant to section 654. (See *People v. Crittle* (2007) 154 Cal.App.4th 368, 370 [§ 654 "does not apply to a court security fee because that fee is not punishment"; even though trial court stayed punishment for robbery conviction, it was required to impose a court security fee based on that conviction]; see also *People v. Schoeb* (2005) 132 Cal.App.4th 861, 865 [§ 1465.8 "unambiguously requires a fee to be imposed for each of defendant's convictions"].)

7

The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Section 186.22, subdivision (b), establishes alternative or additional penalties for felons whose crimes were committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." As used in this statute—the Criminal Street Terrorism Enforcement and Prevention Act of 1988 or STEP Act— "'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated [in portions of section 186.22, subdivision (e) ], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) That definition "necessarily exclude[s] the

8

occasional commission of those crimes by the group's members. . . ." (*Ibid.*) "Past offenses, as well as the circumstances of the charged crime," are relevant to this question and may be considered by the jury on the issue of the group's primary activities. (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1465.)

Ortiz argues Officer Cirrito's testimony identifying the crimes Aztlan had engaged in as a primary activity was similar to expert testimony found insufficient to establish that element of the enhancement in *In re Alexander L.* (2007) 149 Cal.App.4th 605. When asked about the primary activities of the gang in that case, Orange County Deputy Sheriff Craig Lang, who worked in the gang enforcement unit, replied, "'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.'" (*Id.* at p. 611.) That was Lange's entire testimony on the issue. "No specifics were elicited as to the circumstances of these crimes, or where, when or how Lang had obtained the information." (*Id.* at pp. 611-612.) In holding Lang's "conclusory testimony cannot be considered substantial evidence as to the nature of the gang's primary activities," the court found his testimony lacked an adequate foundation: "We cannot know whether the basis of Lang's testimony on this point was reliable, because information establishing reliability was never elicited from him at trial. It is impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." (*Id.* at p. 612.)

Officer Cirrito's testimony, although also lacking information as to the circumstances of the crimes, does not suffer from the same absence of foundation. Cirrito testified he monitored Aztlan and other gangs when he was assigned to the Olympic Division gang enforcement detail and, as part of that assignment, talked to community and gang members, wrote down the gang's history and tracked rivalries and alliances. Cirrito described "establish[ing] a relationship" with the gang members to build trust in order to learn information. With respect to Aztlan, he described gang

9

members' clothing and tattoos and the pride they took in their Aztec culture as well as identified the crimes they committed as a primary activity. Unlike the brief and conclusory testimony at issue in *In re Alexander L., supra,* 149 Cal.App.4th 605 from a gang expert who failed to establish he had any such personal contact with gang members, Cirrito's testimony constituted substantial evidence of the gang's primary activities. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 620 [gang expert's opinion based on conversations with gang members and on his "personal investigations of hundreds of crimes committed by gang members" was sufficient to establish primary activities element of gang enhancement]; *People v. Sengpadychith, supra,* 26 Cal.4th at p. 324; see also *People v. Duran, supra,* 97 Cal.App.4th at p. 1465 [officer's testimony based on his "personal experience in the field gathering gang intelligence, contacting gang members and investigating gang-related crimes" sufficient to prove a gang's primary activities].) Ortiz's argument Cirrito only had personal knowledge Aztlan members had committed gun-possession crimes, not the broader list of crimes he identified after the prosecutor interrupted Cirrito to focus him on the question, is predicated on an unduly cribbed interpretation of the testimony. The foundation Cirrito laid was sufficient to establish he had personal knowledge of all the crimes he enumerated, not simply the gun-possession crimes.

2. *Ortiz Has Forfeited His Argument the Trial Court Abused Its Discretion in Excluding Statements Velasquez Made When She Was Waiting with Ortiz in an Interrogation Room*

During cross-examination of Detective Frettlohr, Ortiz's counsel sought to ask him about surreptitiously recorded statements Velasquez had made after she was placed in an interrogation room with Ortiz. The People objected on hearsay and relevance grounds. Defense counsel explained the detective's testimony about Velasquez's unguarded comments to Ortiz demonstrated her credibility because she said the same things to Ortiz as she had to detectives. The court stated it was not familiar with the issue and admonished counsel for not providing it with transcripts or information in advance of raising it: "See, I mean, again, there are going to be issues. You guys should give this

10

stuff to me in advance so I can look it over. To take me by ambush repeatedly like this is really unfair. If you want reasoned rulings—" Defense counsel immediately responded, "I'll move on, Your Honor." However, the court continued, "No, I'm just giving you some advice, I mean, if this is significant. But as I understand what you are telling me, she is with him, you know. I don't see that survives [Evidence Code] section 352. I mean, the probative value is very very slight. It's cumulative. And the problem with that is that it is extremely prejudicial, because it gets into the whole issue of the defendant and what he said or didn't say. And I don't know how you can put that into context. I haven't read the transcripts. So I would have to really go through to make some kind of analysis."

Ortiz argues the trial court abused its discretion in excluding the evidence because all evidence bearing on witness credibility is relevant; it was not cumulative because it was being introduced for that purpose, not for its content; and it would not be prejudicial to Ortiz because it could be limited to what Velasquez said, not what Ortiz may have said.[7] Ortiz, however, has forfeited his argument: After the court made what plainly was

---

[7]    Ortiz observes the trial court's comments addressed only the question of relevance and prejudice, not the prosecutor's hearsay objection. As we discuss in the text, because Ortiz's counsel elected to move on, rather than press the point, he deprived the court of the opportunity to adequately consider both the nature of the testimony proffered and the validity of the objections asserted. Had the court done so, it is likely the hearsay objection would have been sustained. Under Evidence Code section 1235 evidence of a statement previously made by a witness that is consistent with the witness's testimony at trial is inadmissible hearsay unless offered in compliance with Evidence Code section 791. That latter section permits the admission of a prior consistent statement of a witness only if (a) the witness's credibility has been attacked by introduction of a prior inconsistent statement and the prior consistent statement was made before the alleged inconsistent statement, or (b) an express or implied charge has been made that the witness's testimony is fabricated or influenced by bias and the prior consistent statement was made before the bias or motive for fabrication allegedly arose. Neither ground existed here. No prior inconsistent statement by Velasquez had been used to attack her credibility. Although the prosecutor emphatically argued her testimony was fabricated and the product of bias, her motive for lying—she was Ortiz's girlfriend and pregnant with his child—existed well before the recorded exchange between Velasquez and Ortiz took place.

11

only a tentative ruling (see *People v. Ennis* (2010) 190 Cal.App.4th 721, 736 [distinction between tentative and final ruling "turns on whether the court has *finished* its consideration of the issue"], and expressed its inability to properly consider the issue without first reviewing the transcript of the conversation between Velasquez and Ortiz, Ortiz's counsel decided to "move on." It was incumbent on counsel to press the matter further if Ortiz wanted to preserve it for appeal. (See *People v. Morris* (1991) 53 Cal.3d 152, 195, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [defendant forfeited claimed evidentiary error; "[T]he trial court never made a ruling on Brooks's testimony. Defendant was obligated to press for such a ruling . . . . He failed to do so, thus depriving the trial court of the opportunity to correct potential error."]; cf. *People v. Holloway* (2004) 33 Cal.4th 96, 133 ["A tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself. [Citations.] "'''Where the court rejects evidence temporarily or withholds a decision as to its admissibility, the party desiring to introduce the evidence should renew his offer, or call the court's attention to the fact that a definite decision is desired.'''"]; see generally Evid. Code, § 354.) Rather than do so, defense counsel, likely concerned about contributing to the court's feeling of having been ambushed again, withdrew the proffered evidence. Had counsel pressed the point and permitted the court the opportunity to review the transcript and thoughtfully consider the admissibility of Velasquez's statements, the issue would have been preserved on appeal.

      3. *The Trial Court Did Not Commit Prejudicial Instructional Error*

        a. *Governing law*

A trial court in a criminal case has a duty to instruct on general principles of law applicable to the case (*People v. Blair* (2005) 36 Cal.4th 686, 745), that is, "'"'those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.'"'" (*People v. Valdez* (2004)

12

32 Cal.4th 73, 115.) However, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) We review the instructions de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to determine "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."'" (*People v. Jablonski* (2006) 37 Cal.4th 774, 831; see *Guiton,* at p. 1130 [error in giving instruction that has no application to facts reviewed under harmless error standard in *People v. Watson* (1956) 46 Cal.2d 818].)

### b. *Contrived self-defense* (*CALCRIM No. 3472*)

After instructing the jury on self-defense the trial court further instructed, pursuant to CALCRIM No. 3472, "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." Relying in part on *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*), Ortiz contends the instruction is only proper if the defendant engaged in or threatened to commit violence and, because he was merely driving on city streets, argues the evidence did not justify the instruction in this case. He also argues the instruction was prejudicial because it undermined the "strong evidence" he only shot Herrera in self-defense or, at least, with a subjective belief in the need to defend himself.[8]

---

[8]     The Attorney General argues Ortiz forfeited this argument because he failed to object to the instruction. It is true defense counsel did not expressly object to CALCRIM No. 3472 during the discussion of jury instructions. Nonetheless, the record clearly shows counsel disagreed with the court that driving through a rival gang's territory without more was a provocative act when the court explained it expected the People to argue Ortiz tried to provoke the need to shoot in purported self-defense. Nothing more was needed to preserve Ortiz's argument on appeal. (See *People v. Simon* (2001) 25 Cal.4th 1082, 1103 [purpose of forfeiture doctrine "'"'is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had'"'"].)

13

In *People v. Olguin, supra*, 31 Cal.App.4th 1355, the two defendants, Cesar Olguin and Francisco Mora, attempted to learn from several young men, including John Ramirez, who had crossed out their gang graffiti. This was followed by mutual shouting of geographical gang names, clenching of fists and Mora punching Ramirez. When Ramirez stood up and walked with several of his friends toward Mora, Olguin pulled a gun from his waistband and shot Ramirez in the chest, killing him. Olguin testified he only took the gun out because he thought the people moving toward him were armed and also claimed the gun discharged accidentally when Ramirez grabbed it.

Olguin and Mora were both charged with murder. With the series of self-defense instructions the court instructed, pursuant to CALJIC No. 5.55, the predecessor to CALCRIM No. 3472, "The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense." (*People v. Olguin, supra*, 31 Cal.App.4th at p. 1381 & fn. 10.) Although agreeing with Mora "the instruction had no antecedent in the facts of this case" (*id*. at p. 1381), the appellate court did not hold the instruction was appropriate only when the defendant had engaged in acts of violence or threats of violence. Indeed, the *Olguin* court provided no guidance whatsoever as to when the instruction is proper, suggesting only "'[a] trial judge's superior ability to evaluate the evidence renders it highly inappropriate for an appellate court to lightly question his determination to submit an issue to the jury.'" (*Ibid*.)

---

In any event, as this court has repeatedly reminded the Attorney General, we review any claim of instructional error that affects a defendant's substantial rights whether or not trial counsel objected. (§ 1259 ["[t]he appellate court may also review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"]; *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.) Of course, we can only determine if the defendant's substantial rights were affected by deciding if the instruction as given was flawed, and, if so, whether the error was prejudicial. That is, if Ortiz's claim has merit, it has not been forfeited. Thus, we necessarily review the merits of his contention there was instructional error.

14

Similarly, the language of CALCRIM No. 3472, which uses the word "provoke" without qualification, does not support Ortiz's argument provocation must include violence or the express or implied threat of violence to vitiate the right to self-defense. Provoke means "to arouse to a feeling or action[;] . . . to incite to anger." (Webster's 10th Collegiate Dict. (1995) p. 940.) What may provoke a person exists on a spectrum and necessarily takes into consideration context. (See *People v. Ward* (2005) 36 Cal.4th 186, 215 ["provocation . . . is the defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state"].) For example, words, without violence or a threat of violence, may be sufficient provocation to reduce murder to manslaughter. (See *People v. Valentine* (1946) 28 Cal.2d 121, 140-143 [words alone sufficient]; *People v. Beltran* (2013) 56 Cal.4th 935, 941 [voluntary manslaughter instruction predicated on victim hurling insults and telling defendant she aborted their child because she knew he would leave her one day]; *People v. Manriquez* (2005) 37 Cal.4th 547 583-584 ["provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection"].)

We need not decide whether in the context of gang culture, which fetishizes respect, simply driving through a neighborhood may indeed be provocation that would incite a rival gang member to fight. Even if the evidentiary basis for giving CALCRIM No. 3472 in this case was insufficient, it was, as the *Olguin* court also found, harmless error. (*People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1381.) The jury was instructed to consider CALCRIM No. 3472 in conjunction with all other instructions and told that "[s]ome of these instructions may not apply." The jury is presumed to disregard an instruction if it finds the evidence does not support its application. (See *People v. Frandsen* (2011) 196 Cal.App.4th 266, 278 ["appellants['] assertion that no substantial evidence supported the [contrived self-defense] instruction does not warrant our finding reversible error because the jury is presumed to disregard an instruction if the jury finds the evidence does not support its application"]; *People v. Adcox* (1988) 47 Cal.3d 207,

15

253 [absent a contrary indication in the record, we assume the jury followed the instructions given by the court].)

### c. *Flight and concealment of evidence* (*CALCRIM Nos. 371 and 372*)

The court also instructed the jury it could consider evidence of flight and concealment of evidence as proof of Ortiz's guilt. CALCRIM No. 371 provided, "If the defendant tried to hide evidence that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself." CALCRIM No. 372 stated, "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Ortiz argues it was error to give these instructions because Velasquez's statements to detectives that Ortiz had removed the gun from the house at her insistence did not support a nonspeculative inference he hid any evidence and leaving the scene after Herrera was shot was a matter of survival, not a reflection on his consciousness of guilt. Although not strong, the evidence supporting these instructions was minimally sufficient. Moreover, any error in giving the instructions was harmless because it is not reasonably probable Ortiz would have obtained a more favorable result had they not been given. In addition to the general instruction that not all instructions were applicable, CALCRIM No. 371 itself admonished the jury to consider the weight and significance of the evidence only if it first found the defendant did in fact attempt to hide evidence. CALCRIM No. 372 similarly instructed the jury with respect to flight and further stated, "evidence that the defendant fled cannot prove guilt by itself."

16

## DISPOSITION

The judgment is modified to reflect a minimum parole eligibility date of 15 years on each of counts 1 and 2 and to impose an additional $40 fee under section 1465.8, subdivision (a)(1).  As modified, the judgment is affirmed.  The superior court is to prepare a corrected abstract of judgment and forward it to the Department of Corrections and Rehabilitation.


                                        PERLUSS, P. J.

We concur:


        ZELON, J.


        SEGAL, J.[*]

_____

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.