Filed 8/21/20  P. v. Freeny CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C087210 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F03530) |
| v. | |
| RICKY ALLEN FREENY, | |
| Defendant and Appellant. | |

Defendant Ricky Allen Freeny appeals from his convictions of first-degree murder of Gregory King and firearm and drug offenses.  He contends the trial court erred by (1) instructing on contrived self-defense; (2) instructing on consciousness of guilt; (3) not instructing sua sponte on provocation; and (4) not exercising its discretion to strike firearm enhancements.  We affirm the judgment.

1

FACTS AND PROCEDURAL HISTORY

*Prosecution case*

Nicole Burch and defendant had lived together. Whitney Jacobs, defendant's friend, sometimes stayed with them.

Approximately one and a half weeks before the killing, Burch left the apartment she shared with defendant because he was cheating on her with the mother of his child. Burch stayed with her cousin Erica Smith at Smith's apartment. While there, Burch became acquainted and began a romantic relationship with Gregory King (known as "Zelly") who was also living at Smith's. While she was staying with Smith, Burch saw King with a handgun a few times and a rifle, but she did not see him with a gun on the day of the killing.

In the early morning hours of June 12, 2015, Burch and King were at Smith's apartment drinking and "kickin' it" with other individuals. Burch used cocaine that night. Defendant and Jacobs arrived in defendant's Dodge Magnum. Burch and defendant talked outside about their shared cleaning business and their relationship. Defendant asked Burch questions about her and King but there was no argument. The conversation ended well, and defendant and Jacobs left in the Dodge.

After defendant left, Burch borrowed Smith's Ford Taurus and drove King to a nearby gas station to buy a Backwood, an item used for smoking. When she pulled into the station, Burch saw defendant pulling out of the station. Defendant reversed his car back to where Burch had parked.

Burch asked the station clerk for a Backwood. Defendant stood immediately behind Burch, acting aggressive and "yellin' a little bit," asking her what she was doing with King, telling her to come with him, and accusing her of lying. To Burch, defendant seemed mad at her because she "was in the car with another man."

When the clerk told Burch that he did not have change for a hundred-dollar bill, she walked back to the Taurus. She told defendant she was not going to go with him because he was a liar. She "struggle[d]" to get back inside her car because defendant "stood in the way" yelling, and she had to "move him out [of] the way" to close her car door. Defendant kept yelling. He did not demand money from her. When Burch got in her car and closed the door, defendant punched her car windows twice.

The station clerk heard a "commotion" between Burch and defendant and heard Burch say, "stop it." Jacobs, who remained in the Dodge, could tell defendant was mad at Burch but did not know why.

After defendant punched the Taurus's windshield, King became upset and yelled some things. Burch drove out of the gas station. Defendant followed Burch and pulled up alongside her car. He pulled out a gun and waved it at her as he continued to yell. Seeing the gun, Burch ran the red light and turned left onto the cross street to get away from defendant. King yelled at defendant, "I'm going to kill you" after defendant waved the gun at the Taurus. Both King and defendant made threats toward each other.

Defendant chased after Burch. He pulled up alongside the Taurus on the passenger side, where King was still sitting in the front passenger seat. Defendant yelled at Burch to pull over while he continued to point the gun out the window. Defendant kept waiving the gun a few feet from the Taurus, and then he fired the gun, hitting Burch in her arm. Burch screamed, but King said nothing.

Burch kept driving for a short distance, then stopped the Taurus in the street. She was about five or six blocks away from the gas station. When Burch stopped, so did defendant, still on the Taurus's passenger side. Burch told King to get in the driver's seat and get away. She believed defendant would kill him. She did not believe defendant would kill her, despite defendant yelling that he would kill her if she did not get into his car. She got out of her car and began walking toward defendant's car.

3

Defendant met Burch and helped her walk around the back of the Taurus. He helped her get into his car in the rear driver's side seat. Burch heard both King and defendant yelling. After the yelling, she heard gunshots. She saw defendant standing at the back of the Taurus with a gun shooting at the car. Defendant said, "bitch ass nigga" or "soft ass," and she screamed at defendant not to shoot. Neither Burch nor Jacobs saw King with a weapon or pull out a weapon toward defendant.

Paul Campos, a garbage truck driver, was working about 50 feet from where the Taurus and the Dodge came to a stop. He saw a male get out of the Dodge and point at the car. Then a girl got out of the driver's seat of the Taurus and got into the Dodge's rear driver's side passenger seat. Campos heard the male yelling, and he heard the girl when she walked around the car because she was "sobbing and crying." The two got inside the car "for a second." Then the man opened the door, got out of the car, and stood up with a revolver in his hands. He yelled as he shot into the backseat of the other car. He shot between eight and 10 shots in rapid fire. Fearing he was next, Campos took off, and he saw in his mirror the shooter's car take off.

Defendant drove Burch, himself, and Jacobs to a hospital. Defendant walked Burch up and said to her "do you got me," which Burch took to mean "do you have my back" and "don't tell." Defendant led Burch into the hospital, told the hospital's security guard that his name was Mike Johnson, and gave the guard a phone number that did not work. A bone in Burch's right arm was shattered and she suffered "some nerve damage" in her fingers.

Sacramento Police Department officers recovered the Taurus. It was stopped in the middle of the street with its engine running. They found King dead laying across the car's rear floorboard behind the driver's seat. Police found several casings on the ground on the Taurus's passenger side and one in the windshield. They also found a casing in the street near the gas station. They found no gun or weapon inside the Taurus or on the

4

victim's person.  King died from multiple gunshot wounds to his chest and abdomen.  The pathologist recovered nine slugs from the body.

Police apprehended defendant later that day at a Vallejo motel.  After reviewing the motel's surveillance video, officers determined defendant arrived at the motel in the Dodge at about 6:30 a.m. that morning.  Officers found cocaine base and heroin in the Dodge and in the room.

*Defense case*

Defendant testified.  He admitted he is a convicted felon prohibited from carrying a gun.  Prior to June 12, 2015, he had seen King four or five times.  They had never had a confrontation.  Except on one occasion, King possessed a gun each time defendant saw him.  Once, defendant saw King sleeping on a couch with a gun sticking out of his pocket.

On June 12, 2015, defendant went to Smith's apartment because Burch asked him to bring her some cocaine.  He had a gun with him.  Defendant gave Burch cocaine wrapped in a twenty-dollar bill.  Defendant thought King had his gun in his pants that night because his shirt was "poking out."

After he left Smith's apartment, defendant went to the gas station to get gas.  There he realized he did not have any money to pay for gas, so he started to leave to go get money from Burch.  As he pulled out of the station, he saw Burch and King arrive.  He backed up to a pump, got out of his car, and asked Burch for the $20 he had given her.  She told him no.  He asked for the money multiple times, but she would not give it to him.  He did not try to stop her from getting into her car.  He punched Burch's car window twice because he was angry that Burch would not give him the $20.

When Burch left the gas station, defendant followed to try to get the $20 from her.  As he pulled up on the Taurus, he heard King yell at him in a threatening manner, "this is Eastside Piru."  Defendant took this to be a gang threat.  When the cars were side by side,

5

King said to defendant, "It's a wrap for you. It's bad for you, and I am going to kill you." When King said this, he made "like a motion," but defendant did not see him with a weapon. Defendant shot at King, thinking King was going to pull a gun and shoot him. The shot missed and hit Burch. At this point, defendant could have driven in a direction away from Burch and King, but he chose to follow them.

When both cars stopped, Burch asked defendant for help. Defendant got out of his car and helped Burch get into his car. He saw King in the Taurus "ruffling around in the back doing something." He then saw King "lunge towards [him] with his right arm forward." Defendant did not see if King had a gun, but he "felt like" King had a gun and was trying to kill him, so he fired. He did not know how many times he fired. He "just began to fire."

Defendant drove Burch to the hospital. At the hospital, he gave the security guard a false name and phone number because he did not know what to do. He dropped off Jacobs and went to Vallejo. He threw the gun out of the window as he was driving. He never called the police after the shooting.

*Verdict and sentence*

A jury found defendant guilty of first-degree murder, discharging a firearm at an occupied vehicle, possession of a firearm by a felon, possession of heroin, and possession of cocaine base. (Pen. Code, §§ 187, subd (a); 246; 29800, subd. (a)(1); Health & Saf. Code, § 11350, subd. (a) [statutory section references that follow are to the Penal Code unless otherwise stated].) As to the counts for murder and discharging a firearm, the jury found that defendant personally and intentionally discharged a firearm causing great bodily injury or death. (§ 12022.53, subd. (d).)

The trial court sentenced defendant to prison for five years plus a consecutive 75 years to life, calculated as follows: five years for discharging a firearm into an occupied vehicle plus a consecutive 25 years to life for the firearm use, and a consecutive 25 years

6

to life for the murder plus a consecutive 25 years for the firearm use. The court imposed and stayed a sentence for the firearm possession count and imposed concurrent jail sentences for the drug offenses.

DISCUSSION

I

*Instruction on Contrived Self-defense*

Defendant contends the trial court erred by instructing with CALCRIM No. 3472 on contrived self-defense. He asserts insufficient evidence justified giving CALCRIM No. 3472 and the instruction affected his substantial rights. The doctrine of contrived self-defense is limited to when a defendant "sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance, or fault, to create a real or apparent necessity for killing." (*People v. Hecker* (1895) 109 Cal. 451, 462.)

Defendant claims that no evidence showed he sought to create a pretextual claim of self-defense through his "fraud, contrivance, or fault," and the instruction denied him his right to present defenses of self-defense and imperfect self-defense.

Defendant did not object to the instruction at trial. Nevertheless, "we review the merits of his claim of error regarding the instruction to determine whether the instruction affected his substantial rights. ([] § 1259.) ' "[A] defendant need not assert an objection to preserve a contention of instructional error when the error affects the defendant's 'substantial rights.' [Citation.] In this regard, '[t]he cases equate "substantial rights" with reversible error' under the test stated in *People v. Watson* (1956) 46 Cal.2d 818. [Citation.]" [Citations.] "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim . . . ." ' [Citation.]" (*People v. Jimenez* (2016) 246 Cal.App.4th 726, 730.) We examine the merits "at least to the extent of ascertaining whether the asserted error would

7

result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

"It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1, original italics.)

In *People v. Enraca* (2012) 53 Cal.4th 735, the California Supreme Court repeated this principle and confirmed that two jury instructions the trial court gave in that case correctly expressed the law. The high court wrote, "[T]he trial court instructed the jury on the law as we have just explained it. It gave CALJIC No. 5.55: 'The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense.' Pursuant to CALJIC No. 5.17, the jury was also instructed that the principle of imperfect self-defense 'is not available, and malice aforethought is not negated, if the defendant[,] by his unlawful or wrongful conduct[,] created the circumstances which legally justified his adversary's use of force.' " (*Id.* at p. 761.)

CALJIC Nos. 5.55 and 5.17 are predecessors to two instructions which the trial court here gave to the jury; CALCRIM Nos. 571 and 3472 respectively. The language of the CALCRIM instructions is materially the same as their CALJIC analogs, and thus they also correctly state the law of self-defense. (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1333 (CALCRIM No. 3472); *People v. Lopez* (2011) 199 Cal.App.4th 1297, 1306 (CALCRIM No. 571).)

CALCRIM No. 3472, the instruction defendant challenges, provides: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the

intent to create an excuse to use force." This instruction finds its origin in the passage quoted above from *People v. Hecker, supra*, 109 Cal. 451. (See also *People v. Hinshaw* (1924) 194 Cal. 1, 26.)

Defendant asserts the trial court gave CALCRIM No. 3472 without basing it on evidence of defendant's intent to provoke the victim through fraud, contrivance, or fault into responding with deadly force so that defendant could kill and claim self-defense.

CALCRIM No. 3472 contains a scienter requirement. "By its express language, CALCRIM No. 3472 does not apply to every person who initiates a fight and subsequently claims self-defense. Instead, it applies to a subset of individuals who not only instigate a fight, but do so with the specific intent that they contrive the necessity for their acting thereafter in 'self-defense,' and thus justify their further violent actions. In other words, this instruction applies, and the right to self-defense is lost, only if an initial aggressor commences combat for the intended purpose of provoking a violent reaction so that he or she can then retaliate with further violence, whether deadly force or nondeadly force, under the guise of self-defense. The defendant's intent is measured at the time the fight or quarrel is provoked." (*People v. Ramirez* (2015) 233 Cal.App.4th 940, 954 (dis. opn. of Fybel, J.).)

Substantial evidence existed from which the jury could determine that defendant intended to create through his conduct or fault a pretext for claiming self-defense. When defendant confronted Burch at the gas station, he knew she was there with King and he believed that King had a weapon. He asked to know why Burch was with King and demanded that she go with him. He tried to prevent Burch from getting back into her car. King yelled at him after he hit Burch's windshield. Defendant testified that King threatened him. Believing King possessed a gun, defendant chased after Burch and King, pulled up alongside their car and waved a gun at them while yelling threats. When King did not draw a weapon, defendant fired at King and continued to pursue the Taurus. He admitted he expected King to shoot back.

9

A jury could have reasonably concluded from this evidence that defendant, by chasing after Burch and King, waving a gun at them, and then firing at King while believing King had a gun and would shoot back, intended to provoke King to use deadly force against him so he could return deadly force and claim self-defense. The evidence would support a finding that defendant "provoke[d] a fight or quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472.) The trial court thus did not err in giving the instruction.

Having found no error, we can declare that the trial court's action did not affect defendant's substantial rights. Accordingly, by not objecting to the instruction at trial, defendant has forfeited this claim.

Defendant contends his counsel rendered ineffective assistance by not objecting to the instruction. We disagree. " 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1189, citing *Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674].) An objection would have been futile because substantial evidence supported the instruction. Because an objection would have been futile, counsel's decision not to object did not fall below the standard of reasonableness under prevailing professional norms. "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387.)

II

*Instruction on Consciousness of Guilt*

Defendant contends the trial court erred by instructing the jury with part of CALCRIM No. 371 on consciousness of guilt based on threats made to witnesses by third

10

parties. He claims no evidence supported giving the instruction and the error was prejudicial. His trial counsel did not object to the instruction, but defendant argues that we can review his claim because the error affected his substantial rights. He also asserts that trial counsel rendered ineffective assistance by not objecting to the instruction. The claim is forfeited.

Burch and Jacobs stated they received threats from third parties concerning their participation in defendant's trial. Defendant's mother told Burch not to testify. Defendant's aunt wrote about Burch on social media, "This bitch is gonna get touched." Burch took this to mean she would be "knocked off." Jacobs received phone calls from anonymous people asking if he was going to court.

The challenged paragraph of CALCRIM No. 371 provides: "If someone other than the defendant tried to create false evidence, provide false testimony, or conceal or destroy evidence, that conduct may show the defendant was aware of his guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions. It is up to you to decide the meaning and importance of this evidence. However, evidence of such conduct cannot prove guilt by itself."

Defendant's trial counsel did not object to the instruction, but defendant claims the error affected his substantial rights. To make that determination, we must again examine the merits of the claim at least to determine whether the asserted error would have been reversible error under the *Watson* standard. (*People v. Jimenez, supra*, 246 Cal.App.4th at p. 730.)

The Attorney General agrees with defendant that insufficient evidence supported giving the instruction. There was no evidence showing that defendant either was present and knew about the third-parties' threats or that he authorized the third-parties' actions. Nonetheless, the Attorney General claims the error was harmless, as the instruction itself directed the jury not to consider it in this circumstance, and it also directed the jury not to consider any such evidence as sufficient by itself to establish guilt. Defendant, on the

11

other hand, contends the error was prejudicial because the instruction converted the third-parties' threats into evidence of his awareness of his guilt.

We agree with the Attorney General and find the error harmless. The instruction itself acted as a limiting instruction by informing the jury it could not consider the threats as evidence of defendant's guilt unless "the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions." With no evidence before the jury satisfying either condition, we presume the jury followed the instruction and did not consider the threats as evidence of defendant's guilt. (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)

We note also that neither side mentioned this instruction in their closing arguments, and the prosecutor did not assert or argue that the third-party threats were evidence of defendant's consciousness of guilt. Under these facts, it is not reasonably probable that defendant would have obtained a more favorable result had the court not instructed with the challenged paragraph from CALCRIM No. 371.

Having found the error to be harmless, we can declare that defendant's substantial rights were not affected by the error, and thus counsel's not objecting to the instruction at trial forfeits the claim here.

Defendant asserts counsel rendered ineffective assistance by not objecting. But since the error was harmless, defendant cannot establish he was prejudiced by counsel's omission. If there is no prejudice, there is no ineffective assistance. (*People v. Carter, supra*, 36 Cal.4th at p. 1189.)

### III

#### *Not Instructing on Provocation*

Defendant contends the trial court erred by not instructing the jury sua sponte with CALCRIM No. 522 regarding the effect of provocation on murder. He argues sufficient evidence existed to give the instruction, which if given could have reduced his first-

degree murder conviction to second-degree murder.  Defendant also claims his trial counsel rendered ineffective assistance by not requesting the instruction.  The claim is forfeited.

"Instructions on provocation are pinpoint instructions that need not be given sua sponte but only on request.  (*People v. Rogers* (2006) 39 Cal.4th 826, 878-879.)"  (*People v. Hardy* (2018) 5 Cal.5th 56, 99.)  Defendant forfeited this claim by not requesting an instruction on provocation at trial.  (*Ibid.*)

Defendant argues his trial counsel rendered ineffective assistance by not requesting the court to instruct the jury on with CALCRIM No. 522 on provocation.  We disagree, as defendant has not established that counsel's omission resulted in prejudicial harm.

CALCRIM No. 522 would have informed the jury thus:  "Provocation may reduce a murder from first degree to second degree . . . .  The weight and significance of the provocation, if any, are for you to decide.  [¶]  If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first- or second degree murder . . . ."

"[T]he ' "existence of provocation which is not 'adequate' to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation" '—an inquiry relevant to determining whether the offense is premeditated murder in the first degree, or unpremeditated murder in the second degree.  (*People v. Wickersham* (1982) 32 Cal.3d 307, 329, quoting *People v. Valentine* (1946) 28 Cal.2d 121, 132.)"  (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)  To reduce the crime to second degree murder, the evidence of provocation must show that the defendant "formed the intent to kill as a direct response to the provocation and . . . acted immediately[.]"  (*People v. Wickersham, supra*, 32 Cal.3d at p. 329, disapproved on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 201.)

13

Defendant claims that ample evidence of provocation existed to justify the instruction. The victim threatened to kill defendant, and the victim announced his gang and told defendant, "It's a wrap for you." Such evidence shows provocation, but to justify the instruction to reduce murder to second degree due to provocation, the evidence must show that defendant acted immediately; in other words, that he killed the victim immediately after being provoked.

No such evidence exists here. Defendant testified that King made his first threat that he was Eastside Piru after the two cars pulled out of the station and stopped at the light before turning left onto the cross street. After they turned left, defendant pulled up on King's side of the Taurus. King told him it was "a wrap" and he would kill defendant. Defendant fired his gun at King, but he hit Burch. There is no evidence King made any further threats after the shot. Burch continued driving for some blocks until she stopped and got out of the car. Defendant got out of his car and helped Burch into his car. They both stayed in the car "for a second." Defendant got out of his car and saw King "kind of like ruffling around in the back doing something." King made a lunging motion, and defendant shot him.

King's threats may have provoked defendant to shoot the first time, but there was no evidence of provocation after that moment. Defendant did not kill King immediately after being provoked. Instead, he drove further, stopped his car, helped Burch get into his car—all done without any threats by King—an then he killed King. Because there was no evidence of immediate action after being provoked, defense counsel did not render ineffective assistance by not requesting an instruction that was not supported by the evidence, and defendant suffered no prejudice from his trial counsel's decision.

14

IV

*Cumulative Error*

Defendant claims that the cumulative effect of multiple errors resulted in a miscarriage of justice. A series of errors, though independently harmless, may in some circumstances rise to the level of reversible and prejudicial error. (*People v. Hill* (1998) 17 Cal.4th 800, 844.) That is not the case here as there were not multiple errors, and the only error recognized was not prejudicial.

V

*Discretion to Strike Firearm Enhancements*

In supplemental briefing, defendant contends we should remand so the trial court may exercise the discretion provided to it by Senate Bill No. 620 (Stats. 2017, ch. 682, §§ 1, 2 (SB 620)). SB 620 gave the trial court discretion to strike the firearm enhancements imposed against defendant under section 12022.53, subdivision (d). (§ 12022.53, subd. (h).)

In his supplemental reply brief, defendant acknowledges that SB 620 was in effect at the time he was sentenced. SB 620 went into effect on January 1, 2018. Defendant was convicted on February 9, 2018, and the trial court sentenced him on April 20, 2018. We thus assume the trial court was aware of its discretion to strike the enhancements and that it followed the applicable sentencing law. (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496-497.)

Defendant, however, claims we should remand because the record suggests the trial court was not aware of its discretion under SB 620. The probation report, which was ordered after SB 620 became effective, did not mention the court's discretion under SB 620. Defense counsel at sentencing did not mention SB 620. And the trial court did not mention SB 620 when it imposed the firearm enhancements.

These facts notwithstanding, we will not remand.

15

"Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing. (See *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 530, fn. 13; *People v. Myers* (1983) 148 Cal.App.3d 699, 704.) Defendants are entitled to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion. (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.)

"Remand for resentencing is not required, however, if the record demonstrates the trial court was aware of its sentencing discretion. (*People v. Belmontes, supra,* 34 Cal.3d at p. 348, fn. 8; *People v. White Eagle* (1996) 48 Cal.App.4th 1511, 1523.) Further, remand is unnecessary if the record is silent concerning whether the trial court misunderstood its sentencing discretion. Error may not be presumed from a silent record. (*People v. White Eagle, supra,* 48 Cal.App.4th at p. 1523.) ' "[A] trial court is presumed to have been aware of and followed the applicable law." [Citations.]' (*People v. Martinez* (1998) 65 Cal.App.4th 1511, 1517.)" (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228-1229.)

Here, the record is silent. Nothing indicates the trial court did not understand its discretion under SB 620. That the probation report did not inform the court of its discretion does not establish the trial court was unaware of it. Defendant bore the burden to show affirmatively that the trial court did not understand its sentencing discretion, and this burden was not met. (See *People v. Davis* (1996) 50 Cal.App.4th 168, 172.)

We presume the trial court exercised its discretion under SB 620 when it imposed the firearm enhancements, and we will not ask the trial court to repeat that undertaking.

16

DISPOSITION

The judgment is affirmed.

                                               
_____

                                               
HULL, Acting P. J.

We concur:

_____
MURRAY, J.

_____
HOCH, J.